UNITED STATES DISTRICT COURT

IN THE SOUTHERN DISTRICT OF FLORIDA

A&F BAHAMAS, LLC, a Florida limited
liability company

        Plaintiff,

v.

WORLD VENTURE GROUP, INC., a California
corporation, WORLD VENTURE CAPITAL, INC.,
a New York corporation, ICON COMMERCIAL
LENDING, INC., a Utah corporation, D. GENO
BRUNTON, DESMOND BRUNTON, AMY
ROY-HAEGER, and RANDALL FARR,
jointly and severally,

        Defendants.

Case No.
Hon.

---

HUBBARD, SNITCHLER & PARZIANELLO, PLC
John A. Hubbard (FL
Eric A. Parzianello  (FL Bar 161225)
5/3 Center at Mercato
999 Vanderbilt Beach Road
Suite 200
Naples, Florida 34108
(239) 325-1802
jhubbard@hspplc.com
eparzianello@hspplc.com

PAESANO AKKASHIAN P.C.
Anthony R. Paesano (MI Bar P60173)
Brian M. Akkashian (MI Bar P55544)
7457 Franklin Road, Suite 200
Bloomfield Hills, MI  48301
(248) 792-6886
apaesano@paesanoakkashian.com
bakkashian@paesanoakkashian.com

---

## **COMPLAINT**

1

NOW COMES Plaintiff, A&F Bahamas, LLC, a Florida limited liability company, by and through its attorneys, Hubbard Snitchler & Parzianello, PLC and Paesano Akkashian, P.C., and for their Complaint against World Venture Group, Inc., a California corporation, World Venture Capital, Inc., a New York corporation, ICON Commercial Lending, Inc., a Utah corporation, and D. Geno Brunton, Desmond Brunton, Amy Roy-Haeger and Randall Farr (collectively, the "Defendants"), states as follows:

### PARTIES, JURISDICTION AND VENUE

1.      Plaintiff, A&F Bahamas, LLC ("A&F Bahamas"), is a Florida limited liability company doing business in the State of Florida.  A&F Bahamas is the assignee of any and all claims in this Complaint from Cotton Bay Holdings, Inc., a Delaware corporation ("Cotton Bay Holdings"), and Global Ventures Group, LLC, a Florida limited liability company ("Global Ventures Florida"), which is the assignee of Global Ventures Group, LLC, a New Jersey limited liability company ("Global Ventures Jersey").

2.      Upon information and belief, Defendant, World Venture Group, Inc. ("World Venture Group"), is a California corporation doing business in the State of Florida.

3.      Upon information and belief, Defendant, World Venture Capital, Inc. ("World Venture Capital"), is a New York corporation doing business in the State of Florida.

4.      Defendant D. Geno Brunton ("Geno") is a resident of the State of California doing business in the State of Florida, individually, and as an officer of World Venture Group and World Venture Capital.

5.      Upon information and belief, Defendant Desmond Brunton ("Desmond") is a permanent or temporary resident of the State of Florida, and conducts regular and systematic business in the State of Florida. Geno and Desmond are referred to as the "Bruntons". World

2

Venture Capital and World Venture Group are alter-egos of the Bruntons, and are vehicles used by the Bruntons to facilitate the securities fraud and other tortious conduct alleged herein, and therefore, the Bruntons, World Venture Capital and World Venture Group are collectively referred to herein as the "Brunton Defendants".

6.      Defendant, ICON Commercial Lending, Inc. ("ICON"), is a Utah corporation doing business in the State of Florida.

7.      Defendant, Randall Farr ("Farr"), is a resident of the State of Utah, and conducts regular or systematic business in the State of Florida individually, or as an officer, employee or agent of ICON, or as an agent of World Venture Capital and World Venture Group.

8.      Defendant Amy Roy-Haeger ("Roy-Haeger") is a resident of the State of Florida, and upon information and belief, is an officer of World Venture Capital and/or World Venture Group.

9.      This Court has both general and limited personal jurisdiction over the Defendants on the following bases: (a) Desmond and Roy-Haeger are residents of the State of Florida or were residents of the State of Florida during the time periods at issue in this lawsuit, and (b) Geno, World Venture Capital, World Venture Group, Farr and ICON conduct a substantial, systematic and continuous part of their business in the State of Florida. Moreover, the Brunton Defendants have established significant contacts with the State of Florida and A&F Bahamas' claims in this action arise out of and relate to such contacts with the State of Florida. Defendants have further directed activity in the State of Florida that has affected and impacted the State of Florida and its residents, such that the Defendants should reasonably anticipate being haled into court in the State of Florida. Personal jurisdiction over the Defendants is consistent with due process and does not offend traditional notions of fair play and substantial justice.

3

10.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because a federal question exists as A&F Bahamas has alleged violations of the federal securities statutes.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and/or (b)(3).

## FACTUAL BACKGROUND

12.     Alfred Abiouness, Jr. ("Abiouness") and Robert Fortson ("Fortson") are the members of A&F Bahamas.   In 2009, A&F Bahamas became actively involved in the development, construction, marketing and financing of a resort property in Eleuthera, Bahamas commonly referred to as "Cotton Bay" or "Cotton Bay Club" (the "Project"). The owner of the property in Eleuthera, Bahamas is Eleuthera Properties, Ltd., a Bahamian corporation ("EPL").

13.     A&F Bahamas was the single largest member of Global Ventures Jersey.

14.     On December 4, 2009, Global Ventures Jersey, A&F Bahamas, Abiouness and Fortson, on one hand, and EPL, on the other, executed a master development, construction and financing agreement whereby Global Ventures Jersey would earn shares of Class A common stock in EPL through the contribution of $65,000,000 in construction, development and working capital to the Project (the "2009 EPL Master Agreement"). The 2009 EPL Master Agreement is not produced herein because it is subject to a confidentiality provision.

15.     In early 2011, Global Ventures Jersey was approached by Farr and ICON as a potential direct financier of Global Ventures Jersey's obligations under the 2009 EPL Master Agreement.   Despite holding themselves out previously as direct lenders, Farr and ICON informed Global Ventures Jersey that ICON was not in a position to directly finance Global Ventures Jersey's and A&F Bahamas' obligations under the 2009 EPL Master Agreement, but had access to third-party direct financiers interested in Cotton Bay.

16.     Farr recommended to Abiouness and Fortson that the Brunton Defendants be engaged to coordinate the financing of Global Ventures Jersey's obligations under the 2009 EPL Master Agreement by raising equity through the sale of membership units in Global Ventures Jersey and/or through the issuance of medium term bonds, or notes, collateralized with $100,000,000 in life insurance policies underwritten by A+ rated companies followed by a "going public strategy" whereby a developmental stage or shell company, fully reporting under the rules promulgated by the United States Securities and Exchange Commission (the "SEC"), would be acquired through a reverse merger or business combination, and then common stock from that company would be placed in the public market as part of a larger scale capital raise.

17.     Between September 2011 and November 2011, Geno and Farr had numerous conversations with Abiouness and Fortson regarding the capital raising strategy, costs of the capital raising strategy and the expected results. Having no experience in securities, Abiouness and Fortson reasonably relied on the numerous representations and warranties made by Geno and Farr regarding the capital raising strategy.

18.     The Brunton Defendants held themselves out as direct financiers. Geno and Farr represented that the Brunton Defendants had the means, financing and relationships in the United States and the Caribbean to finance Global Ventures Jersey's financing obligations under the 2009 EPL Master Agreement.  The Brunton Defendants and Farr continually stressed that they had inroads with financing sources as a result of Desmond's history with Cotton Bay in the 1990s as the former financier of the project while employed by certain banks in the Caribbean.

19.     The Brunton Defendants further represented that they had a stable of investment bankers, market makers, transfer agents and other financial and legal advisors positioned to immediately implement a medium term bond raising strategy secured by $100,000,000 in life

insurance policies already on deposit with the Bank of Utah and under their control, and that Global Ventures Jersey could secure these policies through the purchase of certain call options.

20.      As part of its scheme to defraud, the Brunton Defendants and Farr provided marketing materials regarding an "Insured Corporate Stock Program" and promotional materials related to their "Insurance Backed Securities Financing" program, and corresponding flowcharts detailing the "typical WVC project-financed deal" and a "transaction process" worksheet, all of which upon information and belief were prepared by Farr.  These documents proved later to be nothing more than fancy securities sales tools to lure A&F Bahamas into the Brunton Defendants' fraudulent scheme. See **Exhibit A**.

21.      On November 16, 2011, following months of negotiations, representations and constant salesmanship by the Brunton Defendants and Farr, individually and through their respective entities, Abiouness, on behalf of Global Ventures Jersey, and Geno, on behalf of World Venture Capital, executed a "Memorandum of Understanding; Insured Corporate Stock Program." (See **Exhibit B**; the "Memorandum of Understanding").

22.      On November 30, 2011, Global Ventures Jersey and World Venture Capital executed a Financing Agreement, which incorporated and merged the Memorandum of Understanding (See **Exhibit C**; the "Financing Agreement").

23.      The Financing Agreement, which upon information and belief was prepared by Farr, proved later to contain a host of intentionally misleading representations in the context of selling or facilitating the sale of securities, including but not limited to the following:

(a)      In consideration of $550,000 ($275,000 of which was due upon execution and was indeed paid by A&F Bahamas through a loan to Global Ventures Jersey), World Venture Capital would leverage Global Ventures Jersey's rights under the 2009 EPL

Master Agreement and sell Global Ventures Jersey's membership units at a gross sales price of $250,000,000 with net proceeds to Global Ventures Jersey in the amount of $100,000,000 within ninety days, i.e. prior to March 1, 2012;

(b)     World Venture Capital would purchase the call options on the $100,000,000 of life insurance policies serving as collateral for Global Ventures Jersey's private offering of bonds with the $275,000; and

(c)     WVC would prepare the prospectus and other offering documents to effectuate these transactions in a professional and timely manner.

24.     It was at this point that the Brunton Defendants realized that they had Global Ventures Jersey and A&F Bahamas lured in and backed into a corner. The Brunton Defendants knew that Global Ventures Jersey had significant financing obligations under the 2009 EPL Master Agreement and that Global Ventures Jersey was significantly invested, both financially and operationally, in the program promoted by the Brunton Defendants.

25.     Following execution of the Financing Agreement, the Defendants engaged in acts of deceit and securities fraud, directly or through conduits, by, among other things, (a) Farr, Roy-Haeger and Desmond claiming past successful capital raises using the exact strategy set forth in the Financing Agreement when it was later discovered that they had never financed any projects, let alone projects of this magnitude, (b) Geno and Farr meeting with Abiouness and Fortson in Miami, Florida in December of 2011 promoting the use of "their" investment bankers, which were nonexistent, and implementation of their proven capital raising strategies exercising the "call options" on the life insurance policies purchased with the $275,000, which were also nonexistent , (c) Desmond misrepresenting to Abiouness and Fortson that the capital raising

strategy under the Financing Agreement was proven and that the call options and life insurance policies in the Financing Agreement were secure.

26.     It was later discovered that the $275,000 never went to purchase anything for the benefit of A&F Bahamas; rather, upon information and belief, the funds ended up in the Brunton Defendants' bank accounts, and in the accounts of Roy-Haeger, Farr and ICON.

27.     On January 11, 2012, Counsel for Global Ventures Jersey sent the Brunton Defendants a correspondence seeking clarification and affirmation that, amongst other things, the call options were indeed purchased and the life insurance policies were secured. *See* **Exhibit D.**

28.     In response, on January 13, 2012, the Brunton Defendants confirmed "…that World Venture Capital has made deposits on behalf of the transaction to acquire insurance policies for the benefit of Note holders as guaranteed repayment upon maturity of Notices that will be issued on behalf of [Global Ventures Jersey]." *See* **Exhibit E.**

29.     On February 17, 2012, as part of a restructuring, Global Ventures Jersey and the requisite number of members of the entity entered into a dissolution plan whereby, amongst other things, the members of Global Ventures Jersey agreed to assign to Doug Maslo ("Maslo"), a member in Global Ventures Jersey, any and all tangible and intangible assets held by the company, including but not limited to those rights and claims under the Financing Agreement and those rights under the 2009 EPL Master Agreement.   The Financing Agreement was assignable by either party and EPL had authorized the assignment of the 2009 EPL Master Agreement to Global Ventures Florida.

30.     On February 28, 2012, Maslo contributed those assets assigned to him under the Global Ventures Jersey dissolution plan to Global Ventures Florida, whose members are A&F Bahamas and KDK, LLC, a Delaware limited liability company owned solely by Maslo.

31. The Brunton Defendants did not provide the financing represented in the Financing Agreement within the ninety days represented therein, i.e. by March 1, 2012.

32. At this time period, the Brunton Defendants knew that EPL was relying on the Brunton Defendants' representations and warranties under the Financing Agreement, and knew or should have known that their intentionally misleading statements and breaches under the Financing Agreement were significantly impairing Global Ventures Florida's rights under the 2009 EPL Master Agreement.

33. In response, the Brunton Defendants represented to Global Ventures Florida, A&F Bahamas and EPL that the call options on the life insurance policies were secured and on deposit with the Bank of Utah, and that they were prepared for use in the medium term bond program set forth in the Financing Agreement; however, World Venture Capital's investment bankers, who did not exist, were insistent that the private offering had to be issued and offered through a publicly reporting and trading company with the SEC, and thus the $100,000,000 had not been funded through the Financing Agreement. Geno represented that World Venture Group would need to coordinate the public capital raising efforts from this point forward. Global Ventures Florida reasonably relied on these representations.

34. It was also at this time in March of 2012 that the Brunton Defendants demanded that the additional $250,000 under the Financing Agreement be paid in order to finance the call options, holding costs and other expenses to hold the $100,000,000 in life insurance policies for use in the offering through the future public company, and for ongoing investment banker fees, market maker fees, transfer agent fees, and other costs and expenses that the Brunton Defendants, Farr and Roy-Haeger alleged had already been paid out to third-parties in order to avoid the lapsing of the call options on the life insurance policies.

35.     The Brunton Defendants constantly shifted strategies based on the alleged opinions and recommendations of "investment advisors," who did not exist.

36.     In hindsight, the shifting of strategies by the Brunton Defendants from a private offering of bonds through the private company *to* the private offering of bonds through a publicly reporting company *back to* a private offering of bonds and then *to* a combination of a private offering of bonds and issuance of shares in the publicly reporting company was designed to frustrate Global Ventures Florida and more specifically, A&F Bahamas, and to create the perception that the "market" was dictating the changes in strategy when in reality it was merely a ruse to extort more money out of A&F Bahamas.

37.     On March 25, 2012, Global Ventures Florida's entity to be named later, Cotton Bay Holdings, and World Venture Group and "its affiliates, assigns and agents," which included the Brunton Defendants and Roy-Haeger, entered into an Independent Contractor and Financial Services Agreement. See **Exhibit F**; the "Independent Contractor and Financial Services Agreement".

38.     Pursuant to the terms of the Financial Services Agreement, in consideration of $400,000 paid by Global Ventures Florida (which was in addition to the $275,000 already paid by Global Ventures Jersey under the Financing Agreement), the Brunton Defendants agreed to the following performance (all of which never occurred):

(a)     The Brunton Defendants would effectuate the reverse merger with a publicly-traded entity, and that upon execution of the Financial Services Agreement, the Brunton Defendants would produce documents and other information in advance of effectuating the reverse merger to confirm that the entity was indeed publicly trading, as opposed to just publicly reporting;

(b)     The Brunton Defendants would ensure that immediately prior to the aforementioned transaction, the public company would be free of any liabilities, current in all filings required by the SEC and that the stock being acquired would be free and clear of any claims or any restrictions on transfer including any hold-back stockholder claims;

(c)     The Brunton Defendants would effectuate the change of control with the SEC, including but not limited to, securing the board of director resolution approving the transaction, the subscription agreements, stockholder resolutions, employee stock option plan, resignation letters and stock tender letter, which would also encompass filing the proper disclosure with the SEC on the underlying transaction itself;

(d)     The Brunton Defendants would change the business status of the publicly-trading company from shell or developmental stage company to "operating," i.e. prepare and file the Super 8-K, and disclose on the Super 8-K the new description of the business, i.e. the business of Cotton Bay Holdings, and provide audited financials and other material agreements for Cotton Bay Holdings to complete the Super 8-K;

(e)     The Brunton Defendants would effectuate the private offering;

(f)     The Brunton Defendants would effectuate the Form S-1 Registration Statement;

(g)     The Brunton Defendants would engage stock transfer agents and market makers to file FINRA 15c-211 for the stock symbol/ticker incorporating all the information in the Form S-1 Registration Statement;

(h)     The Brunton Defendants would effectuate the listing of Cotton Bay Holdings on the NASDAQ, NYSE or AMEX;

(i)     The Brunton Defendants would create for issuance secured convertible notes, to be sold on a best efforts basis, totaling $300,000,000 to qualified institutional buyers or accredited investors with net proceeds of $100,000,000 to be used towards financing the Cotton Bay project;

(j)     The Brunton Defendants would prepare offering documents;

(k)     The Brunton Defendants would secure the insurance policies backing the offering in an amount equal to 150% of the face amount of the notes, and continue to pay the call option fees on policies previously identified and represented by the Brunton Defendants as existing under the Financing Agreement from November 30, 2011;

(l)     The Brunton Defendants agreed to produce evidence of payment associated with the initial call options, and produce all descriptive information related to the call options previously paid for under the Financing Agreement, and agreed to full transparency acceptable to Cotton Bay Holdings with regard to the insurance policies;

(m)     The Brunton Defendants agreed to be responsible for coordinating with broker-dealer firms for purpose of purchasing the notes, creating the market and selling the notes through the proper private placement offering and/or prospectus;

(n)     The Brunton Defendants agreed to take any and all necessary steps to retain the services of a licensed, bonded and insured escrow agent suited to retain the $300,000,000 balance following the sale of the notes;

(o)     The Brunton Defendants agreed to coordinate efforts with the appropriate escrow agent in maintaining the call options and premiums on the insurance policies for the life of the notes and to pay into escrow the matured insurance policy benefits to provide the return of the face value of notes;

(p)     The Brunton Defendants agreed to maintain the premium payments on the insurance policies for the first three years from issuance;

(q)     The Brunton Defendants agreed to take any and all other action they deemed necessary based on their education, training and experience to perform their duties under the Financial Services Agreement; and

(r)     The Brunton Defendants agreed to indemnify, defend, and hold harmless Global Ventures Florida, and its entity to be named later, i.e. Cotton Bay Holdings, from any and all liability resulting from intentional or reckless acts or the acts of the employees or agents of the Brunton Defendants.

39.     Notwithstanding the repeated requests by Global Ventures Florida to produce the requisite information regarding the alleged publicly trading company, the Brunton Defendants claimed that they were not able to do so because of certain confidentiality issues, even though Global Ventures Florida agreed that it would execute a confidentiality agreement.

40.     The Brunton Defendants insisted that their representations in the Financial Services Agreement, i.e. that the entity was free of liabilities and fully trading, was sufficient and could be relied upon by Global Ventures Florida to pay $150,000 towards acquisition of the majority and controlling stock in the public entity, and in turn, reverse merge into the entity in furtherance of the capital raising strategy set forth in the Financial Services Agreement.

41.     The Brunton Defendants further represented that their investment bankers and market makers had investors lined up to purchase the $100,000,000 in equity, but that they would only do so if the shares were issued by a publicly reporting and trading entity.

42.     On April 27, 2012, relying on the Brunton Defendants' written and oral representations, and concerned over the purported investors moving on to other opportunities,

Global Ventures Florida paid $150,000 to the Brunton Defendants for acquisition of the majority and controlling shares in Tranquility, Inc. ("Tranquility") – the shell company to be used by the Brunton Defendants to perform the reverse merger under the Financial Services Agreement.

43.     Despite making payment to the Brunton Defendants, the Brunton Defendants did nothing to effectuate the reverse merger.  The Brunton Defendants continued to make excuses for their failure to perform under the Financial Services Agreement.

44.     Between execution of the Financial Services Agreement and late April of 2012, the Brunton Defendants, directly and indirectly, represented to EPL that (a) the call options purchased by Global Ventures Jersey, and subsequently assigned to Global Ventures Florida, had secured the life insurance policies to be used under the capital raising strategy set forth in the Financial Services Agreement, (b) the call options and life insurance policies were on deposit with the Bank of Utah, (c) investors were prepared to purchase shares in Cotton Bay Holdings, (d) noteholders were positioned to participate in the bond offering using the life insurance policies as collateral, and (e) Desmond was in the process of coordinating efforts through banks in the Caribbean to purchase the stock or participate in the bond offering, all of which was false.

45.     On May 6, 2012, based on the aforementioned representations, Global Ventures Florida and EPL, amongst others, entered into an amended EPL Master Agreement, which was similar to the 2009 EPL Master Agreement (the "2012 EPL Master Agreement"). The 2012 EPL Master Agreement is subject to a confidentiality agreement and thus has not been attached hereto.

46.     After execution of the 2012 EPL Master Agreement, knowing that Global Ventures Florida and A&F Bahamas had undertaken certain obligations pursuant to the 2012 EPL Master Agreement, and realizing that they had leverage to further their fraudulent scheme,

the Brunton Defendants claimed that the $250,000 in call options needed to be paid immediately in order to secure the life insurance policies or the collateral would be lost.

47.     Despite repeated requests by Global Ventures Florida, the Brunton Defendants kept making excuses for not being able to produce information and confirmation regarding the earlier purchase of the call options for $275,000 under the Financing Agreement. Rather, the Brunton Defendants, Roy-Haeger and Farr continually proclaimed that the call options were indeed secured and that Global Ventures Florida could continue to rely on the representations and warranties under the Financial Services Agreement. However, the Brunton Defendants and Roy-Haeger claimed that the life insurance policies would be lost if the $250,000 in call options were not purchased by May 31, 2012.

48.     On May 31, 2012, Global Ventures Florida, on behalf of Cotton Bay Holdings (which had still not been merged with Tranquility due to the delays of the Brunton Defendants) paid $250,000 to the Brunton Defendants from funds loaned by A&F Bahamas to purchase the call options on the life insurance policies, which did not exist.

49.     On August 1, 2012, following two months of inaction by the Brunton Defendants and under pressure from EPL to finance Cotton Bay in the manner represented by the Brunton Defendants, Global Ventures Florida and A&F Bahamas, through their counsel, finally received the necessary resolutions from Tranquility authorizing the name change of the entity to Cotton Bay Holdings and change in business purpose.

50.     Notwithstanding their agreed upon obligation to undertake full responsibility for effectuating the reverse merger and all future events in raising the necessary capital, the Brunton Defendants did absolutely nothing, leaving Cotton Bay Holdings to use its own legal counsel and

advisors, and to facilitate reporting requirements and attempt to raise the capital and debt promised by the Brunton Defendants.

51.     On August 1, 2012, Cotton Bay Holdings and Global Ventures Florida, and the latter's two secured lenders, Alfred E. Abiouness, Sr. ("Abiouness, Sr.") and RG Development, Inc., a Delaware corporation and a Maslo-related entity ("RG Development"), executed an Assignment of Rights and Title Agreement and an Independent Contractor and Financing Agreement, both of which were subsequently amended on November 6, 2012 and January 10, 2013 (collectively referred to herein as the "CBH Financing Agreements").[1]

52.     The CBH Financing Agreements were executed based on the representations and warranties by the Brunton Defendants that such agreements were necessary for their investment bankers to facilitate the financing strategy under the Financial Services Agreement.

53.     Under the terms of the CBH Financing Agreements, Global Ventures Florida assigned into escrow with Cotton Bay Holdings title to 450 shares of the Class A Common Stock in EPL, which had previously been earned by Global Ventures Jersey and Global Ventures Florida.  The shares would be released out of escrow and titled to Cotton Bay Holdings upon Global Ventures Florida obtaining financing from the Brunton Defendants, and in turn, using those proceeds to finance Global Ventures Florida's obligations under the 2012 EPL Master Agreement.

54.     In late August of 2012, having failed to cover expenses related to the reverse merger or the CBH Financing Agreements, despite their obligation to do so under the Financial Services Agreement, the Brunton Defendants claimed that the capital raising strategy under the Financial Services Agreement required funding to cover ongoing legal fees, investment advisor fees, investment banking fees, holding fees and other expenses associated with the Brunton

---

[1] All agreements executed by Cotton Bay Holdings referenced in this Complaint can be found at www.edgar.gov.

Defendants' performance under the Financial Services Agreement. Notwithstanding their obligation to cover these fees and expenses under the Financial Services Agreement, the Brunton Defendants refused to do so, knowing they could extort additional money out of Global Ventures Florida.

55.     On September 7, 2012, the Brunton Defendants submitted an invoice to "GVG Cotton Bay Holdings, Inc.," which was a non-existent entity, on a World Venture Capital invoice for $52,500 for investment banking fees, legal consultation and payment against the note obligation set forth in the Financial Services Agreement. *See* **Exhibit G**. In order to avoid being shut down by the Brunton Defendants, Cotton Bay Holdings, through a loan from Global Ventures Florida, which had borrowed funds from A&F Bahamas, paid the invoice on September 17, 2012. It was later discovered that there were no investment banking fees or legal consultation. These funds were converted by the Brunton Defendants and Roy-Haeger.

56.     On October 12, 2012, the Brunton Defendants submitted an invoice to "GVG Cotton Bay Holdings, Inc." on a World Venture Capital invoice for $25,000 for investment banking fees and the first "road show," *see* **Exhibit H**, which the Brunton Defendants and Roy-Haeger represented were necessary in order to advance the capital raising strategy under the Financial Services Agreement. Reasonably relying on the Brunton Defendants' representations, A&F Bahamas paid this invoice directly four days later. It was subsequently discovered that there were no investment banking fees and no road shows scheduled, and that these funds were converted by the Brunton Defendants and Roy-Haeger.

57.     On November 21, 2012, the Brunton Defendants submitted another invoice to "GVG Cotton Bay Holdings, Inc." on a World Venture Capital invoice for $55,000 for investment banking fees and four "road shows" for Miami, West Palm Beach, New York and

Los Angeles, which the Brunton Defendants and Roy-Hager represented would commence in January of 2013 based on direction from their investors. *See* **Exhibit I**.

58.     Reasonably relying on the Brunton Defendants' representations, A&F Bahamas paid this invoice directly eight days later, plus an additional $30,000 towards other costs and expenses the Brunton Defendants claimed would be incurred as part of the road show presentations. It was subsequently discovered that there were no investment banking fees and the Brunton Defendants never scheduled road shows.  These funds were converted by the Brunton Defendants and Roy-Haeger.

59.     Shortly after paying for the investor road shows, the Brunton Defendants shifted their strategy yet again based on alleged reports and recommendations from investment bankers and market makers; more specifically, the Brunton Defendants claimed that the investors could not proceed until Cotton Bay Holdings held title to a block of shares of the Class A Common Stock of EPL, as opposed to shares being held in escrow pursuant to the CBH Financing Agreements, as discussed above. Despite repeated requests to speak with these investment bankers and market makers, the Brunton Defendants refused on the basis that the investment bankers and market makers would only deal with them pursuant to confidentiality agreements.

60.     On December 11, 2012, after the demands for additional payments from the Brunton Defendants and representations by Roy-Haeger that the capital raising efforts would be terminated if Cotton Bay Holdings did not pay additional amounts towards the call options, and after another shift in strategy, i.e. the conveyance of 800 shares of Class A Common Stock of EPL to Cotton Bay Holdings, Abiouness, as President of Cotton Bay Holdings sent the Brunton Defendants a Notice of Termination and Demand to Cure under the Financial Services Agreement (the "Termination Notice"). *See* **Exhibit J.**

61.     The Termination Notice demanded, amongst other things, that the call options and/or life insurance policies be transferred to Cotton Bay Holdings pursuant to Section 3 of the Financial Services Agreement, and that a full accounting be provided to Cotton Bay Holdings as part of the Brunton Defendants agreement to full transparency.  The Brunton Defendants never responded; rather, on January 11, 2013, Geno sent his own termination letter setting forth incoherent and objectionable allegations of wrongdoing by Cotton Bay Holdings.  As they had done so often in the past, the Brunton Defendants once again shifted blame for lack of progress on Global Ventures Florida and Cotton Bay Holdings.

62.     On January 10, 2013, reasonably relying on the representations made over the past months by the Brunton Defendants and Roy-Haeger, and fearing that investors would not be receptive to Cotton Bay Holdings' asset holdings (as represented by the Brunton Defendants), Cotton Bay Holdings and Global Ventures Florida executed an Asset Purchase Agreement whereby Cotton Bay Holdings purchased 800 shares of Class A Common Stock in EPL from Global Ventures Florida in consideration for 6,153,846 shares in Cotton Bay Holdings (the "Asset Purchase Agreement").  *See* **Exhibit K**.

63.     The Brunton Defendants, Global Ventures Florida and Cotton Bay Holdings advised EPL of the Asset Purchase Agreement and the Brunton Defendants represented that it was necessary in order to facilitate the capital raising strategy under the Financial Services Agreement.  Notwithstanding the earlier termination letters, the Brunton Defendants continued to represent that the $525,000 in call options were still titled to Global Ventures Florida and/or Cotton Bay Holdings, and that the $100,000,000 in life insurance policies related to those call options were secure with the Bank of Utah.

64.     On January 22, 2013, after receiving no response from the Brunton Defendants and after realizing that no road shows had been coordinated by the Brunton Defendants, Counsel for Cotton Bay Holdings sent a Limited Power of Attorney and correspondence to the Bank of Utah requesting evidence of, "...certain option rights and/or title to life insurance policies designated by World Venture Group to serve as collateral for a secured bond offering on behalf of Cotton Bay [Holdings]." *See* **Exhibit L.**

65.     Shortly thereafter, the Bank of Utah contacted Counsel for Cotton Bay Holdings advising it that it had never heard of World Venture Group or World Venture Capital, and that it did not retain on deposit securities purportedly purchased by World Venture Group or World Venture Capital for the benefit of Global Ventures Florida or Cotton Bay Holdings.

66.     The Brunton Defendants went silent on Cotton Bay Holdings after the Asset Purchase Agreement, the Termination Notice and the correspondence to the Bank of Utah.

67.     Subsequent investigation has confirmed that there were never any insurance policies, no market makers, no transfer agents, no investment bankers and no investment program, and that the entire "program" was simply a fraudulent securities scheme.

68.     The Brunton Defendants, Roy-Haeger, Farr and ICON converted collectively $837,500, and Cotton Bay Holdings, Global Ventures Florida and A&F Bahamas never received the benefit of the securities purportedly purchased.

69.     Due to the fraud perpetrated by the Defendants, the value of Cotton Bay Holdings has been decimated, and due to other breaches detailed herein, this entity is not able to meet its financial reporting obligations under the rules promulgated by the SEC, thus further exposing Cotton Bay Holdings and its officers to potential risk.

70.     On January 29, 2013, as a direct result of the Defendants' breaches under the Financial Services Agreement, violations of federal securities laws and other tortious conduct, and the Defendants' collective fraudulent acts in the context of a securities transaction, EPL exercised its rights under the 2012 EPL Master Agreement declaring default by Global Ventures Florida and A&F Bahamas, and its intention to exercise its contractual right to redeem 811 shares of previously issued shares of Class A Common Stock to Global Ventures Florida.   The Brunton Defendants knew or should have known of EPL's right to redeem these shares, and the corresponding loss to Global Ventures Florida, by virtue of its review of the 2012 EPL Master Agreement and representations to all parties involved of its financing obligations to Global Ventures Florida.

71.     On December 4, 2014, Cotton Bay Holdings assigned all of their respective claims against Defendants to A&F Bahamas. *See* **Exhibit M**.  On December 5, 2014, Global Ventures Florida assigned all of its claims against Defendants to A&F Bahamas, which had been previously assigned to Global Ventures Florida pursuant to the dissolution plan of Global Ventures Jersey. See **Exhibit N**.  As a result of these assignments, Global Ventures Jersey, Global Ventures Florida, Cotton Bay Holdings and A&F Bahamas are collectively referred to in the counts below as "A&F Bahamas and its assignors".

## COUNTS

### COUNT I – VIOLATIONS OF SECTION 17(A)(1) OF THE SECURITIES ACT

72.     A&F Bahamas and its assignors incorporates by reference all prior paragraphs.

73.     During the time period alleged herein, the Defendants, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in

interstate commerce or by the use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud A&F Bahamas and its assignors.

74.     The Defendants knew or were reckless in not knowing of the activities described above.

75.     By reason of the activities herein described, the Defendants violated Section 17(a)(1) of the Securities Act.

### COUNT II – VIOLATIONS OF SECTION 17(A)(2) AND 17(A)(3) OF THE SECURITIES ACT

76.     A&F Bahamas and its assignors incorporates by reference all prior paragraphs.

77.     During the time period alleged herein, the Defendants, in the offer and sale of securities, by the use of the means and instruments of transportation and communication in interstate commerce or by the use of the mails, directly and indirectly, obtained money and property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices or courses of business which operated as a fraud and deceit upon A&F Bahamas and its assignors.

78.     The Defendants knew or were reckless in not knowing of the activities described above.

79.     By reason of the activities herein described, the Defendants violated Section 17(a)(2) and 17(a)(3) of the Securities Act.

### COUNT III – VIOLATIONS OF SECTION 10(B) AND RULE 10B-5 OF THE SECURITIES ACT

80.     A&F Bahamas and its assignors incorporates by reference all prior paragraphs.

81.     During the time period alleged herein, the Defendants, in connection with the purchase and sale of securities, directly and indirectly, by the use of the means and

instrumentalities of interstate commerce or of the mails, employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business which operated as a fraud and deceit upon A&F Bahamas and its assignors.

82.     The Defendants knew or were reckless in not knowing of the activities described above.

83.     By reason of the activities herein described, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

### COUNT IV – VIOLATION OF FLORIDA SECURITIES AND INVESTOR PROTECTION ACT

84.     A&F Bahamas and its assignors incorporates by reference all prior paragraphs.

85.     During the time period alleged herein, the Defendants, in connection with the purchase and sale of securities, directly and indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, made material misrepresentations to A&F Bahamas and its assignors.

86.     The misrepresentations were made with scienter or reckless disregard as to the truth of the communications.

87.     A&F Bahamas justifiably relied upon the misrepresentations in connection with a purchase or sale of securities.

88.     Defendants' misrepresentations were the direct proximate cause of the damages to A&F Bahamas and its assignors.

89.     Defendants are liable for any and available remedies under Florida Securities and Investor Protection Act, Florida Statutes Sections 517.011-517.32.

### COUNT V – BREACH OF CONTRACT (THE BRUNTON DEFENDANTS)

90.     A&F Bahamas and its assignors incorporates by reference all prior paragraphs.

91.     A&F Bahamas and its assignors entered into the Financing Agreement and Financial Services Agreement, respectively, both of which were merged and incorporated into the latter.

92.     A&F Bahamas and its assignors performed their duties and obligations under the Financing Agreement and Financial Services Agreement; more specifically, the payment of $837,500 to the Brunton Defendants.

93.      Despite A&F Bahamas and its assignors' performance, the Brunton Defendants breached the Financing Agreement and Financial Services Agreement in the manners set forth above.

94.     A&F Bahamas and its assignors never excused the Brunton Defendants' performance.

95.     A&F Bahamas and its assignors have sustained actual and consequential damages as a direct result of Brunton Defendants' breach of the Financing Agreement and Financial Services Agreement, including but not limited to, (a) $875,000 paid to the Brunton Defendants for securities and services never received, (b) loss of 811 shares of Class A Common Stock of EPL,  (c) damages sustained as a result of the Brunton Defendants' failure to indemnify and hold Global Ventures Florida harmless, as agreed upon in the Financial Services Agreement, from losses sustained in the litigation entitled *Rainmaker et al. v Global Ventures Florida et al.* in New Jersey Superior Court, and (d) other damages allowed for under the law.

### COUNT VI – FRAUDULENT MISREPRESENTATION

96.     A&F Bahamas and its assignors incorporates by reference all prior paragraphs.

97.     The Defendants, individually and collectively, made material representations of fact, as pled above.

98.     The Defendants' representations were false.

99.     The Defendants' knew that the representations were false when they made them, or they made the representations recklessly and without regard for their truth.

100.    The Defendants' intended A&F Bahamas and its assignors to rely on the representations, and A&F Bahamas and its assignors reasonably relied on the representations.

101.    A&F Bahamas and its assignors were harmed by relying on the misrepresentations.

102.    A&F Bahamas and its assignors' reliance on the Defendants' representations was a substantial factor in causing its harm.

### COUNT VII – CONVERSION

103.    A&F Bahamas and its assignors incorporates by reference all prior paragraphs.

104.    The Defendants' wrongfully exercised dominion over A&F Bahamas and its assignors' personal property, i.e. cash, call options and life insurance policies.

105.    As a result of the Defendants' wrongful exercise of dominion, A&F Bahamas and its assignors were deprived of the use and possession of the personal property.

106.    The Defendants disposed of the personal property in a manner inconsistent with A&F Bahamas and its assignors' property rights.

107.    A&F Bahamas and its assignors sustained those damages as alleged above, plus exemplary and punitive damages as a result of the Defendants' collective malice, fraud and/or oppression.

### Count VIII – Money Had and Received

108.    A&F Bahamas and its assignors incorporates by reference all prior paragraphs.

109.    The Defendants received money that was intended to be used for the benefit of A&F Bahamas and its assignors.

110.    The money was not used for the benefit of A&F Bahamas and its assignors.

111.    The Defendants refuse to give the money back and A&F Bahamas and its assignors have been damaged.

### Count IX – Promissory Estoppel (The Brunton Defendants)

112.    A&F Bahamas and its assignors incorporates by reference all prior paragraphs.

113.    The Brunton Defendants made numerous clear and unambiguous promises to A&F Bahamas and its assignors including, but not limited to, promises relating to the acquisition of financing for the Project.

114.    A&F Bahamas and its assignors relied on the promises made by the Brunton Defendants.

115.    It was both reasonable and foreseeable that A&F Bahamas and its assignors would rely on the promises made by the Brunton Defendants.

116.    A&F Bahamas and its assignors suffered damages as a result of its reliance on the promise made by the Brunton Defendants.

### Count X – Negligent Misrepresentation

117.    A&F Bahamas and its assignors incorporates by reference all prior paragraphs.

118.    The Defendants made material misrepresentations to A&F Bahamas and its assignors related to their collective intentions with regard to those matters set forth in the preceding paragraphs, all of which are incorporated herein.

26

119.    The Defendants' representations were false when they were made.

120.    The Defendants had no reasonable grounds for believing the representations to be true when they were made.

121.    The Defendants intended that A&F Bahamas and its assignors rely on the representations.

122.    A&F Bahamas and its assignors actually and justifiably relied on the representations.

123.    As a result of Brunton's negligent misrepresentations, A&F Bahamas and its assignors have suffered substantial economic loss.

### COUNT XI – BREACH OF FIDUCIARY DUTY (THE BRUNTON DEFENDANTS)

124.    A&F Bahamas and its assignors incorporate by reference all prior paragraphs.

125.    A fiduciary relationship existed between A&F Bahamas and its assignors, on one hand, and the Brunton Defendants, on the other, as A&F Bahamas and its assignors placed their trust and confidence in the integrity and good faith of the Brunton Defendants, and the Brunton Defendants voluntarily accepted that confidence.

126.    As a result of the fiduciary relationship between the Brunton Defendants, and A&F Bahamas and its assignors, the Brunton Defendants owed a fiduciary duty to A&F Bahamas and its assignors.

127.    The Brunton Defendants breached their fiduciary duty to A&F Bahamas and its assignors by taking advantage of the interests of A&F Bahamas and its assignors without A&F Bahamas and its assignors' knowledge or consent.

128.    A&F Bahamas and its assignors suffered damages as a result of the Brunton Defendants' breach.

129.    The Brunton Defendants' breach was the proximate cause of A&F Bahamas and its assignors' damages.

### COUNT XII – VIOLATION OF 18 U.S.C. § 1962(C): RICO

130.    A&F Bahamas and its assignors incorporate by reference all prior paragraphs.

131.    From at least 2012 and continuing to the present, in Florida and elsewhere, Defendants, including their agents and employees, collectively constituted an "enterprise" as defined in 18 U.S.C. § 1961(4) ("Enterprise").

132.    The Enterprise is an ongoing organization that engages in, with activities affecting, interstate and foreign commerce.

133.    At all relevant times, the Defendants knowingly made use of the means and instruments of transportation and communications of interstate and foreign commerce to communicate with one another and with Plaintiffs.

134.    Although the Defendants participate in and are members and part of the Enterprise, each also has an existence apart from that Enterprise. At all relevant times, the Enterprise had an ascertainable structure apart from the racketeering activity in which Defendants engaged. The primary decision-makers for the Enterprise are D. Geno Brunton, Desmond Brunton, Amy Roy-Haeger, and Randall Farr who direct the activities of the Enterprise.

135.    The Defendants control and operate the Enterprise through a variety of means including, but not limited to, agreeing to commit and committing the following acts:

(1)    devising the scheme;

(2)     recommending to Abiouness and Fortson that the Brunton Defendants be engaged to coordinate the financing of Global Ventures Jersey's obligations under the 2009 EPL Master Agreement;

(3)     communicating with Abiouness and Fortson regarding the capital raising strategy, costs of the capital raising strategy and the expected results;

(4)     holding the Brunton Defendants out as direct financiers;

(5)     representing that Defendants had a stable of investment bankers, market makers, transfer agents and other financial and legal advisors positioned to immediately implement a medium term bond raising strategy secured by $100,000,000 in life insurance policies already on deposit with the Bank of Utah and under their control, and that Global Ventures Jersey could secure these policies through the purchase of certain call options.

(6)     developing marketing materials regarding an "Insured Corporate Stock Program" and promotional materials related to their "Insurance Backed Securities Financing" program, and corresponding flowcharts detailing the "typical WVC project-financed deal" and a "transaction process" worksheet;

(7)     making the misrepresentations set forth above; and

(8)     submitting invoices to non-existent entities for payment.

136.    The Enterprise pursued a course of deceit, misrepresentation, concealment and conspiracy to defraud A&F Bahamas and to collect profits from those actions, which continues to the present and threatens to continue into the future.

137.    Defendants engaged and continue to engage in conduct violating 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), to effectuate the scheme.

138.    To execute the scheme, Defendants in violation of 18 U.S.C. § 1341 and 1343 transmitted or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, pictures and sounds, and caused things to be placed in a post office or authorized depository, or deposited things to be sent or delivered by a private or commercial interstate carrier.

139.    A&F Bahamas incorporates the Exhibits hereto, identifying Defendants' use of wire and mail communications in furtherance of the scheme in Exhibits A-C and E-K.  To the extent those Exhibits do not include the exact dates of and persons involved in each act, those details are in the exclusive control of one or more Defendants.

140.    Defendants' acts of fraud and concealment were intentional and committed to deceive A&F Bahamas and obtain their money for Defendants' gain. Defendants either knew or recklessly disregarded the fact that their statements and omissions were material, and A&F Bahamas would have acted differently if it had known the true facts.

141.    As a result of the scheme, Defendants obtained money belonging to A&F Bahamas, which has been injured in its business or property by Defendants' overt acts of mail and wire fraud.

142.    To the extent Exhibits A-C and E-K do not include details concerning the exact dates of and persons involved in sending the preceding matters or things, those details are in the exclusive control of one or more of the  Defendants, and/or other persons presently unknown to A&F Bahamas.

143.    The acts identified above and in Exhibits A-C and E-K were done intentionally and knowingly with the specific intent to advance the scheme, or with knowledge the use of mails would follow in the ordinary course of business, or that such use could have been foreseen,

even if not intended. Defendants executed the scheme in different states within the United States and could not have done so unless they used the Postal Service or private or commercial interstate carriers.

144.    Defendants knowingly, willfully and unlawfully conducted or participated in the affairs of the Enterprise through a "pattern of racketeering activity," within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the Enterprise.

145.    Defendants committed or aided and abetted the commission of at least two acts of racketeering activity, set forth in the Exhibits in the past five years. The Racketeering Acts were not isolated, but had the same or similar purpose, participants, method and victims, including A&F Bahamas.

146.    Each Racketeering Act was committed pursuant to and in furtherance of the Enterprise, including false and misleading statements, concealment and acts of fraud, as well as other uses of the mails and wire transmissions.

147.    Defendants' Racketeering Acts were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

148.    Defendants violated 18 U.S.C. §§ 1962(c) by conducting, or participating directly or indirectly in the conduct of the affairs of the Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§1341 and 1343.

149.    As a direct and proximate result, A&F Bahamas and its assignors have been injured in their business or property by the predicate acts that make up Defendants' pattern of racketeering activity through the Enterprise.

## COUNT XIII

### Violation of 18 U.S.C. § 1962(d): RICO – Scheme

153.     A&F Bahamas and its assignors incorporate by reference all prior paragraphs.

154.     In violation of 18 U.S.C. § 1962(d), the Brunton Defendants have, as set forth above, conspired to violate 18 U.S.C. § 1962(c). The conspiracy commenced at least as early as June 2006 and continues to the present. The object of the conspiracy was to defraud A&F Bahamas to benefit the Defendants.

155.     Each Brunton Defendant knowingly, willfully and unlawfully agreed and combined to conduct or participate in, directly or indirectly, the conduct of the affairs and activities of the Enterprise through a pattern of racketeering activity, including acts indictable under 18 U.S.C. §§1341 and 1343, in violation of 18 U.S.C. § 1962(c).

156.     The Brunton Defendants agreed to orchestrate the Scheme and develop the fraudulent practices set forth above.

157.     The Brunton Defendants committed numerous overt acts of racketeering activity or other wrongful activity in furtherance of said conspiracy as set forth above.

158.     The purpose of the acts that caused injury to A&F Bahamas was to advance the overall objective of the conspiracy, and the harm to A&F Bahamas was a reasonably foreseeable consequence of the Brunton Defendants' scheme.

159.     As a direct and proximate result, A&F Bahamas and its assignors were injured in their business or property by the conspiracy and by the predicate acts that make up Defendants' pattern of racketeering activity through the Enterprise.

## PRAYER FOR RELIEF

WHEREFORE, A&F Bahamas respectfully requests that this Court grant the following relief:

### I.

Enter judgment in favor of A&F Bahamas and its assignors and against the Defendants, jointly and severally, in an amount necessary to compensate A&F and its assignors for all economic loss suffered as a result of Defendants' misconduct, plus any and all prejudgment interest, attorney fees, costs, consequential damages and exemplary and punitive damages allowed for under the law, and any other damages deemed appropriate by this Court.

### II.

An Order directing the Defendants to disgorge their ill-gotten gains, plus prejudgment interest thereon.

### III.

An Order compelling specific performance on the Defendants to produce upon demand the call options related to the $100,000,000 in life insurance policies.

### IV.

An Order compelling specific performance on the Defendants to produce upon demand the $100,000,000 in life insurance policies.

### V.

Granting such other and further relief as to this Court seems just and proper.

Respectfully submitted,

/s/ Eric A. Parzianello
John A. Hubbard (FL Bar 100925)
Eric A. Parzianello  (FL Bar 161225)
5/3 Center at Mercato
999 Vanderbilt Beach Road
Suite 200
Naples, Florida 34108
(239) 325-1802
jhubbard@hspplc.com
eparzianello@hspplc.com


/s/ Anthony R. Paesano
Anthony R. Paesano (MI, P60173)
Brian M. Akkashian (MI, P55544)
PAESANO AKKASHIAN P.C.
Attorneys for Plaintiff
7457 Franklin Road, Suite 200
Bloomfield Hills, MI  48301
(248) 792-6886
apaesano@paesanoakkashian.com
bakkashian@paesanoakkashian.com

Dated:  January 2, 2015



# INSURANCE BACKED SECURITIES FINANCING

**Utilizing Insurance Products such as Life Insurance Policies and Life Settlements - as 100% collateral on debt structured finance:**

Collateral using life insurance policies as an institutional investment asset class, as a securitization facility for any financing transaction is a way of collateralizing many of our clients projects. The Explanation is below:

Various structural formats using the "collateral" exist, including

**1)** funding for an amount equal to the project requirements;
**2)** funding for an amount equal to the project requirements plus premium requirements;
**3)** funding for an amount equal to the project requirements, premiums, and interest requirements and/or debt service/operating costs;
**4)** funding for an amount equal to the project requirements as well as all other cash needs as well as total repayment of principal-all with no risk of loss of investment by the investor/lender.

## BENEFITS TO PARTICPANTS:

**A- Issuer**

1) Typically a Lower Cost of Financing
2) Faster funding timeframe
3) Lower or no equity "kickers" (depending on the structure of the deal)

**B-Investment Bank**

1) Significantly faster funding
2) More transactions completed per period
3) Ability to attract new clients
4) Higher fees, commissions and profits from "collateral"

**C-Investor/Lender**

1) Reduce risk of loss of principal
2) Potential higher rate of return through participation in collateral
3) Lower reserves due to securitized feature
4) More investments due to lower reserves leading to higher investment income



EXHIBIT
A

Life Insurance Policy (LIP) portfolios are a new investment asset class that provides an insured principal, higher returns than the standard investment deal, short term investment facility that is normally a safer and more efficient securitization of investment and debt capital than the higher return financial instruments of recent history. In the past, many investment bankers and financial institutions utilized zero coupon bonds purchased at a discount from face value as securitization or "collateral" to facilitate the consummation of various types of financing transactions, including debt, leveraged debt, quasi-equity and straight equity. Not every transaction was suitable for that model and a variation of concept known as "junk" bonds emerged to induce financing dependent upon the selection of successful companies that could not qualify for investment grade debt but could pay higher costs for "junk" bond debt and also repay the principal when due.

There are and have been a variety of different methods of providing additional securitization or "collateral" for projects needing third party financing. Each of these methods contains advantages as well as flaws and investors and financial institutions are always seeking better, safer and more profitable methods of accomplishing their investment goals of higher returns and repayment of loaned funds.

The life insurance policy as an asset class provides higher returns of more predictable terms with insured principal that is provided through the expectation of human mortality and the "Mortality Gain" that is produced either sooner or later during individuals' economic life cycles. The life insurance defines the economic value of each individual's life. Most individuals never capitalize the human economic value. The market place for the purchase of such individuals' unused economic value has expanded to over $100 billion per year in the US alone and is increasing as the population ages. An active secondary market also exists that creates "market" liquidity.

Insurance industry data indicates that approximately 90% of all Universal Life Insurance policies lapse before a death benefit is paid. Further, there are currently in excess of $100 billion of such policies which can be sold by individuals for amounts in excess of the cash surrender values of their existing policies. Billions of dollars of un-used human economic value can be capitalized and purchased at a discount. Present market values and/or the future death benefit value are then used to securitize of "collateralize" financing projects to insure return on invested capital and to insure return of invested capital. All parties to the senior life settlement transactions benefit.

Currently, financial giants such as Berkshire Hathaway, HSBC, Deutsche Bank, Bank of Ireland, Scottish Re, Credit Suisse, AIG, UBS, hedge funds and individual investors are active in various aspects of the nascent life insurance and settlement industry. A question frequently asked of us is, "What is our firm losing by not participating in this industry segment?"

Large financial institutions have quietly been responsible for the exchange of billions of dollars of life insurance and settlement portfolios. The LIP asset class has produced significant fees, commissions and profits to these participants. Generally, LIPs have been aggregated by these participants for use as a "coupon" type of financial instrument similar to mortgage pools, which produces higher levels of yield with greater safety.

When the final structure is examined, one would agree that this method requires an over collateralization by the issuer to provide margins of safety for total "securitization" With proper analysis and evaluation, the correct type of issuer a transaction can be structured that produces an outcome in which the issuer, the investors/lenders, the sellers of the policies, and the investment banker all benefit from a completed transaction with no loss of principal.

The "Senior Life Settlement" segment of the life insurance and investment industries is also expanding and maturing. Early participants in this industry tried to create a date certain/date of death provision for "Investment Grade Senior Life Settlements" with limited results. The entrance of many large financial institutions into the market has now accelerated the acceptance of senior life settlements as an alternative investment asset class that has multiple uses. Senior life settlements currently provide one of the most efficient methods now available for securitization and collateralization purposes.

WVC has developed proprietary processes that abate the need for re-insurance utilizing a normal life expectancy system of calculation. LIPs are a form of "collateral" that makes a good transaction better, but does not make a bad transaction good.

In administering a LIP transaction WVC examines and integrates a vast amount of data beginning with a true due diligence study of the transaction, the amount of the collateral that should be purchased to provide complete assurance for all parties. Implementation of the transaction requires access to the following capabilities:

a.  A nationwide network to provide policies.
b.  Developed proprietary financial software to evaluate policies.
c.  Actuarial data used to review policies.
d.  Insurance Policy Contract review to ensure transfer of ownership.
e.  Ownership Purchase Agreements.
f.  Insured Release Contracts.
g.  Beneficiary Release Contracts.
h.  Appropriate Power of Attorney, from all parties.
i.  Irrevocable Life Insurance Trust Agreements.
j.  Policy Purchase Agreements.
k.  Policy Sale Agreements.
l.  Funding Agreements.
m.  Escrow Agreements.
n.  Physical possession of original policy.
o.  Change of Ownership.
p.  Change of Beneficiary.
q.  Notification from Insurance Company.
r.  Premium Management.
s.  Death Tracking.
t.  Policy Claim Submission.
u.  Payment to Escrow Agent for Disbursement.
v.  Payment to Lenders.
w.  Payment to Company.

Each transaction involving "collateral" has many financial structure issues as well as the usual other considerations facing any transaction. There are many companies in the market place claiming that they will merely "buy" policies and "deliver" them at closing. This simplicity is not an accurate portrayal of what is required to properly complete a transaction involving "Life Insurance Policies" or "Senior Life Settlements". Such transactions require experienced, highly skilled professionals working as a team to accomplish the goals of Securitized transactions.

While every transaction requires thorough evaluation and due diligence scrutiny to determine proper financing structure and "collateral" levels, the major consideration is sufficient cash flow activity of the issuer/project to justify the use of "securitized transactions." Private investors / lenders are more flexible due to the underlying date certain threshold issues but are not a requirement.

Typically, a "secured transaction" will require the issuer to raise additional sums in order to acquire and service the "collateral", usually at rate of 1.2 to 1.4 x of the original face amount of financing sought. The cash cost and underlying life expectancies of the policies is a matter which must be addressed early in the structuring process. Whether shorter (5 years) expectancy, more expensive policies or longer (8-10 years) expectancy, less expensive policies are chosen, as well how large a pool of collateral to use, can only be determined by professional evaluation. The entire process is better suited for longer range transactions as opposed to short ones (1-3 years). This structure allows an investor/lender to manage any downside volatility of the underlying investment while enjoying the upside potential without risk of loss of principal.

An Investment Banking firm must decide which portion of the transaction it wishes to participate in. Participation generates commissions, fees and equity participations that are generated by the "collateralized" transactions.

**Transaction Mapping:**

This is how the typical transaction is mapped out utilizing this type of structured finance:
(Sample mapping of an actual transaction)

$163M NEEDED FOR (Investment) - Primary lender will only loan LTV @ 25% of face value of $1.2B of a portfolio of Life Insurance Policies (LIP).

**Step 1** ---- Bridge lender Loans (Investment) $64M to purchase $1.2B of LIP but keeps his loan and bought LIP in a mutually agreed upon escrow account until closing with Primary Lender. (It takes 60 to 90 days to accumulate the LIP)

**Step 2** --- (Primary Lender) loans $300M at closing against the $1.2B of LIP at LTV of 25% after 90 days.

$1,200,000,000 in LIP are held in a mutually agreed upon escrow account for (Primary Lender) as collateral for $300M loan.

**Source of Funds:**

$1,200,000,000 LIP  needed to receive funds from Bridge Lender

--- times 25% LTV from (Primary Lender)
--- $300,000,000 Monies from (Primary Lender) Loan

**Step 3** --- At closing with (Primary Lender) Bridge lender is paid back its bridge loan and interest.

---$300,000,000 Loan Funds to (Investment) are used to cover:

| | |
|---|---|
| 1) (Investment) ------------------- | $163,000,000 (To Build Investment) |
| 2) Bridge Lender --------------------- | $64,000,000 (repay bridge loan) |
| 3) Bridge Interest @25%---------- | $16,000,000 (pay interest) |
| 4) Pay LIP premiums/fees------- | $57,000,000 |
| Total Use of Funds------------ | $300,000,000 |

**Step 4** --- LIP of $1,200,000,000 stays in escrow account to pay principal

Return of Principal plus ROI

A) Could be liquidated at anytime to repay $300M loan plus interest.

# The Private Placement Offering
# and
# Life Settlement Related Securities

## The Big Picture

• Companies need capital to operate or, in the case of investment funds, to acquire pools of assets
• Capital can be provided by a company's founders, borrowed as a loan or raised from outside investors
• When capital is raised from investors, it can be in the form of debt (notes) or equity (shares or units)
• Issuing debt or equity in exchange for investment is the sale of securities

## Regulation of Securities Sales

Every time a security is sold in the U.S., two different regulatory regimes must be satisfied

• Federal laws – including but not limited to:
– Securities Act of 1933
– Securities Exchange Act of 1934
– The Investment Company Act of 1940

• State "Blue Sky" laws. Each state has its own securities laws that must be satisfied

## Registration of Securities

• As a general rule, securities sold in the U.S. must be registered with the Securities and Exchange Commission ("SEC") under the Securities Act of 1933 ("Securities Act") prior to sale, unless an exemption is available for the sale
• Registration is expensive, requires disclosure of significant financial and business information, is time consuming and subjects the issuer to ongoing, periodic reporting requirements

## Exemptions from Registration

• Both state and federal laws contain exemptions from registration
• It is worth repeating - unless there is an applicable exemption, the sale of the securities must be registered
• Exemptions under federal law include, but are not limited to:
– Section 3(b) – sales under $5,000,000
– Section 4(2) – sales not involving a public offering
– Regulation D – a "safe harbor" rule for private placements of securities under Sections 3(b) or 4(2)

## State "Blue Sky" Regulations

• Each U.S. state has its own securities registration requirements and its own exemptions from state registration
• Most states have private offering exemptions similar to the federal exemptions, but each may have its own, specific requirements
• The National Securities Markets Improvement Act of 1996 ("NSMIA"), preempts state registration requirements for certain securities offerings, including private offerings of securities exempt under Rule 506 of Regulation D (discussed below)
• States have the right to regulate fraudulent activities, broker-dealer sales activities and other aspects of all offerings

## Antifraud Obligations

• Notwithstanding the applicability of any state or federal exemption from registration, antifraud obligations always apply
• Rule 10b-5 under the Exchange Act makes it unlawful for any person, directly or indirectly, in connection with the purchase or sale of any security:
-- To employ any device, scheme, or artifice to defraud
— To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
-- To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person

## Section 4(2) Exemption

• Section 4(2) of the Securities Act exempts from registration "transactions by an issuer not involving any public offering"
• Rule 506 of Regulation D is a "safe harbor" for Section 4(2); complying with 4(2) outside of Rule 506 can require complex analysis
• The specific requirements for establishing an exemption under Section 4(2) are not stated in the Securities Act
• Case law and SEC interpretations have established basic requirements for satisfying Section 4(2):
— Purchaser must have enough knowledge and experience in finance and business matters to evaluate risks and merits of the investment and be able to bear the investment's economic risk
— Limited number of offerees – no specific limit, but the more offerees the more likely the offering will not qualify
— No public solicitation for investment
— Securities must be acquired for investment, not for resale

• Reliance on 4(2) may be sufficient for very limited offerings to a small group – such as founders or "friends and family"

• Burden of proof of the availability of an exemption falls on the party claiming the exemption, not the government
• Offering securities to even one person who does not meet the exemption requirements will cause the entire offering to be in violation of the registration requirements of the Securities Act

## Regulation D: The Basics

• The SEC created Regulation D in 1982 in order to clarify the available statutory exemptions and improve the predictability for non-public offerings under Section 3(b) (offerings under $5,000,000) and Section 4(2)
• Regulation D is a series of eight rules, Rules 501-508, establishing three transactional requirements from registration

## Regulation D: Advantages and Disadvantages

• Advantages:
– Faster and more efficient means of raising capital than registered offering or other forms of outside financing
– May not have to give up as much ownership or control
• Disadvantages:
– Limitations on the type and number of purchasers
– Restrictions on the manner of sales
– Restrictions on re-sales of the securities
– Disclosure requirements
– Legal expense (while significantly less than a registered offering) still substantial

## Rule 501 Definitions and Terms In Regulation D

• "*Accredited Investor*" includes:

– Corporation, partnership, LLC or business trust, not formed for purpose of acquiring the securities, with assets in excess of $5,000,000
– Natural person whose net worth (exclusive of primary residence), or joint net worth with spouse, exceeds $1,000,000
– Natural person with income in excess of $200,000 in last two years, or joint income with spouse in excess of $300,000 in last two years, with reasonable expectation of reaching same income level in current year
– Trust, not formed for purpose of acquiring the securities, with assets in excess of $5,000,000, and purchase is directed by a "sophisticated person"
– Any entity in which all of the equity owners are accredited investors

## Rule 502 General Conditions to be Met

• Rule 502 addresses integration, information requirements, restrictions on resale and solicitation
– Integration/Aggregation: Six month safe harbor for integration of offerings. Within the six months, integration depends upon a five factor test. Twelve month aggregation period important for Rule 504 and Rule 505 offerings.
– Information requirements: No requirements for accredited investors. For non-accredited investors, information similar to public offering must be furnished to the offeree
– Limitations on resale: Generally, securities purchased under Regulation D cannot be resold without registration or an exemption therefrom. The issuer must police this requirement.
– Manner of sale restrictions: Securities may not be offered or sold by way of any general solicitation or general advertising

## Rule 502(c) Limitations on Manner of Offering

• Generally, neither the issuer nor any person acting on its behalf shall offer securities by any form of general solicitation including, but not limited to advertising (television, radio or written), or seminar or meeting attendees of which were invited by general solicitation or advertising
• For example, cannot give interviews announcing launch of an offering or a new fund

• SEC Staff interpretations have suggested the most critical factors in determining whether a general solicitation has occurred are:
– Relationship between issuer and person making communication, and between person making communication and offeree
– Timing and subject matter of the communication
– SEC looks for a pre-existing, substantive business or personal relationship between the issuer and the potential investor
– Rule of Thumb: If you can invite a person over for dinner, you can approach for investment in a private placement

• Little guidance available on how much time must pass between first introduction to a prospective investor and offering of a security such that a prior substantive relationship exists at time of offer
• One-week period between initial "cold call" and following up on call with a securities offering has been held insufficient to establish relationship. *S.E.C. v. Credit First Fund, LP*, 2006 U.S. Dist LEXIS 96697 (C.D.Cal 2006)

• In a no-action letter (*Bateman Eichler*), the SEC did not object to a 45-day waiting period between initial contact with a potential investor and the securities offering, provided the offering was not initiated at the time of the initial contact
• In another no-action letter (*In Lamp Techs, Inc.*), the SEC did not object to a 30-day waiting period between when the potential investor qualified for access to a website only accredited investors could view and when the investor could invest in a fund listed on the site. The SEC allowed the offering to be ongoing at the time of the investor's qualification.
• Placement agents, such as licensed broker-dealers, may be used for private placements

• Registered investment advisers are not permitted to receive compensation for the sale of the securities
• Both B-Ds and RIAs are subject to the solicitation restrictions, and must have a pre-existing substantive relationship with an offeree
• If an issuer violates Rule 502(c) (or other requirements of Regulation D), and an investor is unhappy with the investment, the investor might be able to force the issuer to repurchase the securities
• The issuer can effectively end up being the "guarantor" of the security if it does not comply with the requirements for a valid exemption from registration

## Rule 503 Filing of Notice of Sales

• An issuer selling securities under Rule 504, Rule 505 or Rule 506 must file with the SEC five copies of a notice on Form D no later than 15 days after the first sale of securities
• If sales are made under Rule 505, the notice shall contain an undertaking by the issuer to furnish to the SEC, upon the written request, information furnished by the issuer under Rule 502(b) to any purchaser that is not an accredited investor
• Note this satisfies federal law only, obligations under state blue sky law will still have to be satisfied

## Rule 504 Sales of Securities Not Exceeding $1,000,000

• No limit on number of investors, accredited or non-accredited, and no specific disclosure requirements
• No restrictions on manner of offering or resale of securities so long as one of the following is met:
– Offering is made exclusively in one or more states that provide for registration and the offering is conducted in accordance with those state provisions;
– Registration and sale takes place in a state that requires registration and disclosure delivery, and buyer lives in a state without such requirements, so long as disclosure documents in state of registration are delivered to all purchasers; or
– Securities are sold exclusively according to state law exemptions from registration that permit general solicitation and general advertising so long as sales are made only to "accredited investors"

## Rule 505 - Sales of Securities Not Exceeding $5,000,000

• Sales are permitted to up to thirty-five non-accredited investors and to an unlimited number of accredited investors
• Disclosure requirements of Rule 502(b) must be met if there are any non-accredited investors
• Prohibition against general solicitation or general advertising applies
• Investors must purchase for investment, and not resale
• Securities sold are restricted

## Rule 506 - Sales without Regard to Amount of Offering

• No dollar limitation of the offering
• Sales are permitted to up to thirty-five non-accredited investors and to an unlimited number of accredited investors
• If non-accredited investors are included, issuer is required to determine that each investor meets a certain sophistication standard, either individually or in conjunction with a "Purchaser Representative"
• Disclosure requirements of Rule 502(b) must be met if there are any non-accredited investors
• Securities sold are restricted

## Rule 506 - Safe Harbor Rule

• Securities offered under Rule 506 are *covered securities* under NSMIA, which preempts state securities registration requirements
• States may not require the registration of private placement offerings that comply with the requirements of Rule 506
• States are permitted to require a notice filing, a consent to service of process and a filing fee
• Many states require filing of copy of Form D
• NSMIA does not affect the ability of the state regulators to conduct investigations and to bring fraud actions

## Rule 507 and Rule 508

• Rule 507- Disqualifying Provisions: No exemption under Rules 504, 505 or 506 is available to an issuer if issuer or any predecessors or affiliates have been subject to any order or judgment of any court temporarily, preliminarily or permanently enjoining such person for failure to comply with Rule 503
• Rule 508- Insignificant Deviations: A failure to comply with a term, condition or requirement of Rules 504, 505 or 506 will not result in the loss of the exemption if the failure:
– did not pertain to a term, condition or requirement directly intended to protect that particular individual or entity,
– was insignificant with respect to the offering as a whole; and
– the Issuer made a good faith attempt to comply with all applicable terms, conditions and requirements of the exemption

## Private Placement Memorandum (PPM)

• If the offering is made to accredited investors only, there is no requirement that a PPM be provided to offerees
• If there are any non-accredited investors, then PPM should be provided to all investors
• Even with all accredited investors, a written PPM reduces ambiguity and the risk of allegations that the issuer made certain representations to the offeree in connection with the offering
• For offerings involving more than a very small number of investors, it is generally advisable to provide a PPM to all investors

## Anatomy of the WVC PPM

- There is no really set or required "form" for a PPM and our PPMs vary based on each deal
- Active participation by the issuer in drafting the PPM is essential
- Most PPMs disclose significant information about the issuer, including:
  – A summary of the offering
  – Explanation of use of offering's proceeds
  – A description of the issuer's business
  – Contact information for the issuer
  – Issuer's management, including biographical information about officers and directors
  – The existence of related party transactions and potential conflicts
  – Risks associated with purchasing the security
  – A description of the security being offered
  – A summary of the issuer's governing documents (operating agreement if a LLC, limited partnership agreement if a LP, etc)
  – A description of investor suitability standards
  – A discussion of the issuer's relevant competitors
  – General discussion of material tax consequences of investing in the security
  – Subscription procedures
  – An accredited investor questionnaire
  – Certain SEC-required disclosure
  – Any relevant exhibits to the PPM
  – Any required state blue sky legends

## Anatomy of the WVC PPM- Risk Factors

- The "Risk Factor" section of the PPM sets out the risks of investing in the issuer and the security
- Risk factors should be carefully tailored to address the specific risks of the issuer and offering
- Failure to disclose relevant risks can result in claims of fraud
- Mitigating factors (disclosing the risk, but then stating what is being done to mitigate it) should be avoided

## Life Settlement Specific Risk Factors

- There are a number of risk factors that are unique to securities offerings based on life settlements, including but not limited to:
  – Life settlements are an illiquid investment
  – Imprecision of life expectancies can have a significant impact on return
  – Advances in disease prevention or unexpected cures
  – Premium payments can be miscalculated
  – Risk of challenge by former beneficiaries or family members
  – Insurable interest issues
  – Regulatory risk

## Private Placement Offering Process

• Commencement of offer is generally determined by when PPM is ready for distribution
• Termination depends on type of offering:
– All or nothing – has a fixed date by which minimum amount must be raised or offering terminates
– Best efforts – may continue until all of the offered securities are sold
• A properly structured private placement should incorporate certain procedures, including:
– All PPMs should be numbered, with the offeree's name on the cover
– A distribution control sheet should be created and monitored, recording to whom and when each PPM is sent, and if it was returned
– A sales control sheet should be maintained reflecting sales of the securities as they occur and the purchaser's state of residence (for Blue Sky purposes)
-- Subscription agreements should be reviewed and approved by the issuer
– Confirmations should be sent to subscriber upon acceptance of subscription
– Form D should be filed within 15 days of first sale (note some states have requirements that differ)
– A complete file with copies of all documents for each subscriber should be maintained

## Use of Escrow Account

• There are no explicit escrow requirements for "best efforts" offerings
• The Exchange Act contains specific requirements for "all or none" or "part or none" offerings
• Rule 10b-9 requires that if specified number/dollar amount of securities not sold within specified time, all monies must be returned to investors
• Rule 15c2-4 requires that monies received from investors be deposited in a segregated bank account governed by an escrow agreement

## The Private Placement of Life Settlement Securities

• A significant number of private placements offering life settlement-related securities have occurred
• Different offerings include:
– The sale of interests (shares, units, LP interests) in a pool of life settlement policies
– The sale of fractionalized interests in individual life settlement policies
– The sale of notes secured by life settlement policies
– The "swap" of life settlement policies in exchange for other assets

## The Private Placement of Life Settlement Securities – Pool of Policies

• The offering of interests in pools of life settlement policies is the most common structure
• LP interests or units (typically, a partnership structure is used) are sold for cash and the cash is used to purchase life settlement policies
• The success or failure of the investment will be determined by whether the policies mature as predicted

## The Private Placement of Life Settlement Securities – Fractionalized Interests

• Virtually no court has followed the *SEC v. Life Partners* precedent
• It is a prudent practice to treat fractionalized interests in life settlements as securities
• In some structures, there is a PPM per policy offered (typically for larger face policies)
• Fractionalizing individual policies presents certain unique issues for PPM drafting

## The Private Placement of Life Settlement Securities – Debt

• Debt (notes/bonds) can be secured or unsecured; and, if secured, collateral can be a pool of policies or an individual policy
• Terms of the debt will vary depending on the issuer's needs and investors' appetites
• Almost by definition the notes/bonds/debentures will be unrated – obtaining a rating is currently very unlikely
• Other than risk factors associated with the underlying collateral (if secured), notes issued by entities holding life settlements are similar to notes issued by entities holding pools of other assets

## The Private Placement of Life Settlement Securities – Swaps

• Swap in a literal sense – a life settlement policy with a face value significantly exceeding the current worth of a fixed asset (house, plane, boat, car, etc.) is exchanged for one or more life settlement policies
•Whether or not this is a securities transaction is a facts-and circumstances analysis, but, since these transactions are often undertaken with individual investors (rather than institutions) it would be advisable to treat them as securities transactions
• As with fractionalized policies, drafting a PPM around these transaction presents unique challenges

## Additional Regulatory Changes for Private Placements

• In January 2011, FINRA proposed Regulatory Notice 11-04 in which it proposed to change FINRA Rule 5122 concerning private placements to expand its applicability to all private placements handled by the broker-dealer, subject to exemptions
• The Rule requires that at least 85 percent of the offering proceeds must be used for the business purposes identified in the offering document. In addition, the rule requires each offering document to be submitted to FINRA to allow the staff to conduct *ex post* reviews to assess compliance with the rule and to identify problematic terms and conditions

**Flow Chart of a Typical WVC Project-Financed Deal**
**Stage 1**



**Transaction Process - Stage 2**





## MEMORANDUM OF UNDERSTANDING
### Insured Corporate Stock Program

This MEMORANDUM OF UNDERSTANDING (the "Memorandum" or "MOU") made this 16th day of November, 2011, by and between World Venture Capital, Inc. (hereinafter referred to as "Financier") and Global Ventures Group, LLC (hereinafter referred to as "Client") is as follows:

WHEREAS, Client is seeking financing for the construction and development of its project known as Cotton Bay located in the Bahamas, in the amount of Sixty-Five Million Dollars ($65,000,000).

WHEREAS, Financier agrees to finance Client via the sale of stock collateralized by the issuance of insurance policies.

WHEREAS, Financier agrees to contract with Market Maker and Broker Dealer firms such as Morgan Stanley, UBS Securities, Merrill Lynch and Spartan Securities to purchase the stock, create a market, and sell the stock via a public vehicle to finance Project.

IT IS MUTUALLY UNDERSTOOD AND AGREED BY AND BETWEEN THE PARTIES THAT:

1. Financier agrees to finance the sale of stock issued on behalf of Client, backed by insurance policies, either privately or publicly by acquisition of an existing public company and engage the services of the Market Makers and Broker Dealers as mentioned above in order to capitalize the public company that Financier acquires and in turn have that public entity finance Client's project in the amount of Sixty-Five Million Dollars ($65,000,000) in exchange for an equity participation of not more than Twenty-Five Percent (25%) of Client's stock which is to be paid when stock is sold or bank loan is received.

2. Financier further agrees that Company is to pay into escrow the matured insurance policies to insure the return of the face value of the stock plus a Fifty Percent (50%) return to Company's stockholders, which shall pay off the stock or bank loan in Ten (10) Years leaving Client free and clear. The payment of funds into escrow is for the benefit of the insurance companies issuing said policies.

3. Client agrees that it will pay the amount of $475,000 for all required due diligence, project review and issuance of a Prospectus (to be reviewed and accepted by Market Maker & Broker Dealers) based on Client's business plan and stated business or project operations, inclusive of all required deposits on insurance premiums.

4. Client further agrees to pay Ten Percent (10%) of net profits derived from the operation of Client's project for the first Ten (10) Years into a designated escrow, payable to Company's stockholders.

5. This MOU is not intended to, and does not create, any legal right, benefit, or trust responsibility, substantive or procedural enforceable by law or equity, by any party to this agreement, against Client, Financier, its agencies, officers, or any 3rd party person to this transaction.

6. The laws of the State of New York, USA, shall govern the validity of this MOU.

World Venture Capital >
a World Venture Group company

www.worldventurecapital.net
www.worldvg.com

New York I London I Los Angeles
a Global Structured Finance firm

EXHIBIT

B

7. AUTHORIZED REPRESENTATIVES:  By signature below, the parties certify that the individuals listed in this document as representatives of the parties are authorized to act in their respective areas for matters related to this agreement and the final Financing Agreement.

8. Financier attests to Client that Client will receive the benefits represented herein as established with the following procedures:

    a) Client submits to Financier a summary of project for Financier's initial approval.

    b) Upon preliminary approval Financier delivers MOU to Client for Client's execution.

    c) Once Financier receives the executed MOU, Financier shall arrange a conference call between Client and Financier's VP of Finance and/or CEO to discuss the project and answer questions about the program, and to determine amount of stock needed for project.

    d) Client delivers to Financier any additional due-diligent documents as requested by Financier, and Financier delivers to Client the Financing Document for their review and approval.

    e) Upon Client's approval and execution of Financing Document, Client wire transfers to Financier, no later than 72 hours, the amount of $237,000, at which point (1) Financier, through its designated law firm, begins the drafting of the Prospectus; (2) Financier shall conclude its final due-diligence; and (3) Financier shall pay initial deposits on insurance premiums and have Market Maker and Broker Dealers approve Prospectus.

    f) Client receives copy of the Prospectus for final approval. Once approved and delivers same to Financier, Client wire transfer to Financier's Legal and Securities Representatives the balance of the funds of $237,000.

    g) Upon Client completing step 6 above, (1) Financier shall acquire Company; (2) Financier shall pay initial deposits on insurance premiums; (3) Financier shall engage the services of the Market Maker and Broker Dealers.

    h) Financier shall monetize the stock via sale of shares of stock to the exit buyers and subsequently finance Client in the amount of Sixty-Five Million Dollars ($65,000,000).

    i) Financier becomes a shareholder of Client and receives up to two seats on the board of directors and takes Twenty-Five Percent (25%) of Client's stock issued for executing the transaction and funding the purchase of the insurance backed stock. *

9. Financier and the Client agree to fully cooperate with one another in completing the transaction outlined above and to execute all documents in a timely manner to achieve a successful Closing.

10. The terms of this MOU and all related information and documents are strictly confidential. Such information shall not be used for any purpose other than that set forth in this MOU and shall not be disclosed to any person, third party brokers, or entities other than Financier and Client, and their respective attorneys and advisors, without prior written consent of the party supplying such information.

At the request of either party, representatives given access to such confidential proprietary information shall be required to execute a standard non-disclosure agreement binding themselves to the foregoing provisions.

*GVG is a limited liability company, and therefore does not have a board of directors with seats to offer.  However, GVG is willing to accommodate WVC's request for access and information about GVG's organization decision making strucutre TBD.

11. The foregoing outlines our understanding as to the form and terms of the transaction and the financial arrangements between Client and Financier related to the transaction as outlined herein.

Kindly confirm your understanding and agreement to the foregoing.

Sincerely,

**SIGNED FOR AND ON BEHALF OF CLIENT: Global Venture Group, LLC**

**REPRESENTED BY: Mr. Alfred Ablouness Jr.**
**TITLE: Partner**
**DATED:**

**D. G. Brunton**
CEO, World Venture Capital, Inc | Chairman, World Venture Group

World Venture Capital >
a World Venture Group company

www.worldventurecapital.net
www.worldvg.com

New York | London | Los Angeles
a Global Structured Finance firm

TRANSACTION CODE:                         WVCWVG1-CB110111-CBNY100LN75
POLICY BATCH TRANSACTION NUMBER:          113011-us175ms| WVC_2*12/1
STRUCTURED FINANCE AGREEMENT              EQUITY

---

### FINANCING AGREEMENT
#### (Hereinafter the "AGREEMENT")

Effective this November 30th, 2011, **Global Ventures Group, LLC** ("GVG" / "CLIENT"), with its offices located at 467 Middlesex Ave, Metuchen, NJ 08840 represented by Mr. Alfred Abiouness Jr., with Passport No (USA): 211088711  and Mr. Douglas Maslo, with Passport No (USA): __095906333__  with full personal and corporate authority to execute and perform this Contract, hereinafter referred to as the **"(Client)"; And**

World Venture Capital, Inc ("WVC" / "FINANCIER") with their principal offices located at 620 Newport Center Dr, 11th fl, Newport Beach, CA 92660, represented by D.G. Brunton hereinafter referred to as the "**Financier**".  GVG and WVC are also referred to as the "PARTIES".

NOW, THEREFORE, the Client and the Financier agree to the following terms and conditions of the Agreement which will be in effect from the date hereof to its Expiration Date as hereinafter set forth.

### Objectives

CLIENT wishes to receive funding from Financier for corporate, project development purposes against issued stock certificates, guaranteed by insurance policies with the terms stated below. CLIENT hereby warrants that they are able to deliver the required cost to engage in this transaction on the terms and conditions stated; CLIENT understands that a Prospectus shall be written on its behalf, based on information provided by the Client and once complete, stock shall be issued and valued for sale at a price mutually agreed upon by Client, WVC and its broker dealers / market makers; said stock shall be backed by insurance policies at 150% of the value of the stock issued; should the CLIENT elect to go public via reverse merger, Financier will be notified and an amendment attached to this agreement:

### Terms and Conditions

CLIENT, for their part will provide a deposit of 50% of the required fee for the procurement of a Prospectus, Due Diligence and deposits on insurance premiums (in the amount of TWO HUNDRED & SEVENTY FIVE THOUSAND USD - $275,000) as consideration for the work listed in the contract below, together with the delivery of one business plan, complete with Pro Forma financial statements and projections. WVC agrees to provide financing in the amount of (40%) of the face amount of the stock issued and provided, delivered to GVG either electronically via DTC or Clearstream or in hard copy.

The Financing proceeds will be made on the schedule listed below after the posting, settlement and verification of the SHARES SOLD with good, clean and clear funds of non criminal origins.

(CLIENT)                                                    (WVC)

EXHIBIT
C

TRANSACTION CODE:                          WVCWVG1-CB110111-CBNY100LN75
POLICY BATCH TRANSACTION NUMBER:           113011-us175ms | WVC_2*12/1
STRUCTURED FINANCE AGREEMENT               EQUITY

CLIENT agrees that the fees required for the procurement of the Prospectus and all other activities required to execute the transaction as described herein are $550,000; Client agrees to pay to WVC the balance of $275,000 upon delivery and acceptance of the Prospectus that conforms to SEC and industry standards and reflects the information as provided by the Client in its business plan and other supporting documentation. Should the prospectus written on behalf of the Client not be accepted by Client, Client shall instruct securities attorneys of the required changes in writing for resubmission to Client.

CLIENT agrees that FINANCIER shall receive 25% of all stock issued for and on behalf of Client from this transaction and should Client elect to undertake a reverse merger and go public, said stock shall have all available conversion options into free trading stock. CLIENT further agrees that FINANCIER shall arrange for the sale of CLIENT'S stock as represented in the prospectus and said arrangement shall be considered a separate performance, executed by parties disparate from this agreement who will be paid fees for performance not included in this agreement.

CLIENT further agrees to pay Ten Percent (10%) of net profits derived from the operation of Client's project for the first Ten (10) Years into a designated escrow account; said dividends are payable to Company's stockholders and shall not exceed the required 10%.

CLIENT agrees that FINANCIER is free to assign, transfer or sell stock provided to FINANCIER from the execution of this agreement to any party it chooses. The proceeds of this financing will be paid to the account referenced herein within a scheduled delivery based on cash management procedures implemented by the Financier:

**Non-Performance**

1. In the event that Financier does not issue stock valued at $250,000,000 backed by insurance policies and attempt to execute on a best efforts basis, funding by the sale of stock in accordance with the Drawdown Schedule ("**Financier Non-Performance**"), then Client may withdraw from the agreement with no further obligation to Financier and this Agreement shall be deemed null and void, unless the Financier has already provided a draw of funds and may be delayed in subsequent releases from the process of the sale of stock due to banking delays or holidays.

2. Notwithstanding anything to the contrary contained in Section 1 of this Non-Performance clause, prior to withdrawing or otherwise to sell stock on its own, Client must provide Financier with notice of its intent to claim default and Financier shall have fifteen (15) banking days to cure the default and release the applicable proceeds to Client (the "**Non-Performance Cure Period**").

3. In the event that Financier does not release the proceeds to Client during the Non-Performance Cure Period, then Client shall have the immediate right to terminate this agreement without any additional notice to Financier once Client has repaid funds due to Financier as a result of advances made on Client's

(CLIENT)                                                              (WVC)

| | |
|---|---|
| TRANSACTION CODE: | WVCWVG1-CB110111-CBNY100LN75 |
| POLICY BATCH TRANSACTION NUMBER: | 113011-us175ms| WVC_2*12/1 |
| STRUCTURED FINANCE AGREEMENT | EQUITY |

---

behalf by the sale of stock to broker dealers ("**Termination Instructions**"). Financier shall not, under any circumstances, oppose Client's Termination Instructions.

**Procedures**

1. CLIENT returns signed Financing Agreement.
2. After counter signatures by both parties the contract is activated.
3. FINANCIER arranges for the procurement of PROSPECTUS and stock, backed by Insurance Policies.
4. WVC delivers, for review by Client, Prospectus.
5. Client reviews, authenticates as an accurate representation of its business plan and accepts the PROSPECTUS. This is done in writing as notice to Financier.
6. PROSPECTUS is delivered to Financier in final form, along with stock, delivered electronically and by hard copy.

**Undertaking**

1. Financier undertakes and covenants, on a best efforts basis, to arrange for the sale of the Client's stock, based on its business plan as represented in the PROSPECTUS totaling TWO HUNDRED AND FIFTY MILLION with net proceeds of ONE HUNDRED MILLION USD ($100,000,000) to PRIVATE AND INSTITUTIONAL INVESTORS. Funds procured from sale of stock shall be free and clear of any liens, holds or encumbrances.
2. Financier undertakes to provide for the acquisition of insurance policies and keep payments for premiums current from the sale of stock as represented in the PROSPECTUS.
3. Financier undertakes to have $250,000,000 of stock, valued at an agreed upon strike price, issued and sent electronically to Client's securities account (thereby increasing Client's assets by $250,000,000 in value).
4. Client's full performance and understanding, as set forth herein:
   - CLIENT agrees to the terms and conditions.
   - CLIENT agrees to deliver proof of its readiness to proceed with the project and receive funding by submission of all required documents (within 5 business days of their receipt of the final PROSPECTUS), which include agreements to purchase (land or property), M&A agreements, title documents, escrow instructions, permits (including construction and all building permits), licenses, construction plans, design plans and permits, all necessary government approvals required to green-light the project.

**Tax Consequences to the Parties**

Neither WVC nor GVG makes any representations regarding the tax consequences of the proposed investments, if any, in any jurisdiction covered by this Contract. It is agreed by the Parties hereto that each accepts its liability for taxes, imposts, levies or charges that arise as a result of the return on the investment, without any right of contribution or indemnification by the other Parties.

(CLIENT)                                                                                      (WVC)

| | |
|---|---|
| TRANSACTION CODE: | WVCWVG1-CB110111-CBNY100LN75 |
| POLICY BATCH TRANSACTION NUMBER: | 113011-us175ms | WVC_2*12/1 |
| STRUCTURED FINANCE AGREEMENT | EQUITY |

**Termination of Contract**

Subject to the provisions of this Contract, no Party shall be entitled or empowered to terminate this Contract during the term hereof. Normal termination will occur with the conclusion of all investment transactions covered under the terms and conditions of this Contract unless otherwise extended by mutual agreement.

**Communications**

COORDINATES FOR COMMUNICATION: D.G. Brunton – CEO
World Venture Capital, Inc
Address (Mail to): 220 Newport Center Dr, #585, Newport Beach, CA 92660
Telephone: 888-900-6895 | Fax: 949-271-4977 ¦ Email: dgbrunton@worldventurecapital.net

COORDINATES FOR COMMUNICATION: Alfred Abiouness, Partner,
Global Ventures Group, LLC
Address: 1314 East Las Olas Blvd, Suite 1036, Fort Lauderdale, FL 33301
Telephone: 954-914-4616 | email: info@globalventuresgroupllc.com

(CLIENT)S BANKING DETAILS FOR USD WIRE TRANSFER -

| | |
|---|---|
| Bank name: | Bank of America |
| Swift Code: | BOFAUS3N |
| Address: | 401 East Las Olas Blvd., Fort Lauderdale, FL 33301 |
| Account #: | 229029266253 |
| Account Holder: | Global Ventures Group, LLC. |

*The Client's Attorney reserves the right of change the banking coordinates for payment hereunder after the execution of the contract(s) for the underlying, contemplated business activity as identified above.

**Notices**

All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by facsimile transmission, telexed or mailed by registered or certified mail (return receipt requested), postage prepaid, to The Parties at the address as set forth below, or at such other address for a Party as shall be specified by like notice; provided that the notices of a change of address shall be effective only upon receipt thereof.

Any notice to be given hereunder by any Party to the other(s) shall be in writing, addressed to the receiving Party or Parties, and forwarded to the address or the electronic facsimile(s), telephone number(s) as shall be provided in accordance with the provisions of this Contract, with the effective date of delivery being One (1) of the following:

(CLIENT)                                                                                      (WVC)

| TRANSACTION CODE: | WVCWVG1-CB110111-CBNY100LN75 |
| POLICY BATCH TRANSACTION NUMBER: | 113011-us175ms | WVC_2*12/1 |
| STRUCTURED FINANCE AGREEMENT | EQUITY |

- the date of personal delivery thereof;
- the date of electronic facsimile transmission thereof if transmitted on Monday through Friday, excluding holidays, at a time prior to 2:00 p.m. in the applicable time zone of the recipient, or as of the next date which falls on Monday through Friday, excluding holidays, in the applicable location of the recipient.
- if transmitted via commercial courier, at the expiration of ninety-six (96) hours following deposit thereof with Federal Express, Airborne Express or other authorized international courier service; or
- If mailed, at the expiration of (12) calendar days following deposit thereof with a national postal service, with directions for priority/ express delivery, postage prepaid.

Each Party , from time to time, change its address, telephone number and/or electronic facsimile telephone number by providing the other Parties with (2) days advance written notification thereof.

**Entire Agreement of the Parties**

This Contract represents the entire agreement between The Parties and supersedes all existing contracts and agreements previously executed between The Parties and any representations, either written or oral, by one Party to another with respect to the subject matter hereof. This Contract shall be modifiable only in writing, duly executed by all Parties.

**Binding Agreement**

This Contract, to be executed by all Parties, shall be for the benefit of, and be binding upon, the signatories hereof, their agents, directors, officers, representatives, heirs, personal representatives, successors and assigns, and is inclusive of the protocol provided in the guidelines of the International Chamber of Commerce, Paris, France (ICC) with respect to "Non-Circumvention" and "Non-Disclosure".

**Governing Law**

This agreement shall be construed and governed by the Laws of the State of New York.

**Attorneys' Fees and Costs**

If any legal action or other proceeding is brought in connection with this Agreement, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees and other related costs, in addition to any other relief to which the Party is entitled.

(CLIENT)                                                                    (WVC)

TRANSACTION CODE:                           WVCWVG1-CB110111-CBNY100LN75
POLICY BATCH TRANSACTION NUMBER:            113011-us175ms | WVC_2*12/1
STRUCTURED FINANCE AGREEMENT                EQUITY

---

**Severability of Contract**

The provisions of this Contract are severable, and if any One (1) or more provisions be determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions and any partially enforceable provisions, to the extent enforceable, shall nevertheless be binding and enforceable.

**Termination**

The termination of this agreement shall be deemed fulfilled upon full receipt of (40% LTV) of the face value of the stock issued as represented in the PROSPECTUS in Cash Funds by CLIENT as per this agreement. Provided the Financier should fail in its obligation as prescribed herein, CLIENT has the option to immediately use any possible means available to sell its own stock as represented in the PROSPECTUS and provide equity to parties to which it has sold stock. Upon completion of this Agreement, the Parties may mutually agree to renew this agreement.

**Assignment of Contract**

Any Party may assign this Contract for the benefit of this transaction with the prior written consent of the other Party.

**Modification of Contract**

There shall be no modifications of this Contract unless the same shall be in writing and duly executed by authorized representatives of the Parties with the same formality as the instant Agreement.

**Informed, Voluntary Execution of Contract**

The undersigned signatories to this Contract acknowledge and affirm that they fully understand their obligations with respect to this Contract; that they have had adequate time and opportunity to consult with legal counsel of their choice prior to the execution of this Contract; that they are fully informed in the premises; and that each has executed this Contract freely and voluntarily, without reservation or exception.

**Confirmation of Authorization of Parties' Signatories**

The undersigned signatories to this Contract acknowledge and affirm that they are duly authorized signatories and have full legal capacity to initiate and execute all legal obligations arising from this Contract. The signatories, whose endorsements appear herein for Financier and CLIENT respectively, hereby represent that they each are acting with full corporate authority, and with full knowledge and at the direction of the officers and/or Board of Directors of their respective companies.

(CLIENT)                                                          (WVC)

TRANSACTION CODE:                          WVCWVG1-CB110111-CBNY100LN75
POLICY BATCH TRANSACTION NUMBER:           113011-us175ms | WVC_2*12/1
STRUCTURED FINANCE AGREEMENT               EQUITY

---

**Execution of Contract in Counterparts; Facsimile Copies Acceptable**

This Agreement shall be bound and sealed, each and every page shall be initialed, and the signatures of the Parties' duly authorized representatives shall be affixed as indicated below. The Parties stipulate and agree that this Contract be assigned in counterparts, duly initialed and executed by each Party for the above. When each counterpart, duly initialed and executed, and delivery thereof has been made to each Party respectively, this Contract shall then be considered to be an original, binding agreement between The Parties, whether received in hand, delivered by mail or courier, or transmitted via electronic facsimile transmission.

In witness whereof, the Parties have executed this financing agreement as of the date set forth above. All signed copies of this Agreement shall be deemed originals:

DATED:  November 30th, 2011                 DATED:  November  30th, 2011
Financier: World Venture Capital, Inc        Global Ventures Group, LLC

Signature:                                   Signature:

_____             _____
D.G. Brunton                                 Alfred Abiouness, Jr
Title: CEO                                   Title: Partner

DATED:  November 30th, 2011                 DATED:  November 30th, 2011
Financier: World Venture Capital, Inc         Global Ventures Group, LLC

Signature:                                   Signature:

_____             _____
Phil Harrington                              Douglas Maslo
Title: VP Int'l Finance                      Title: Partner

(CLIENT)                                                              (WVC)

Page 7 of 11

TRANSACTION CODE:                    WVCWVG1-CB110111-CBNY100LN75
POLICY BATCH TRANSACTION NUMBER:    113011-us175ms│ WVC_2*12/1
STRUCTURED FINANCE AGREEMENT        EQUITY

---

### Memorandum of Understanding

RECITALS

1. Whereas, we, World Venture Capital, Inc  hereby confirm our firm's interest in providing for your capital needs by providing Financing against the issuance of a PROSPECTUS that represents the Clients business and is supported by stock with a total value of $250,000,000 and backed insurance policies equal to 150% of the face value of the stock issued. We are prepared to immediately move forward and initiate the transaction subject to the following terms & conditions:

- Whereas, it is agreed that the PROSPECTUS as requested by the referenced Client of the Financier herein shall be for the net amount of ONE HUNDRED MILLION USD ($100,000,000) against TWO HUNDRED & FIFTY MILLION USD ($250,000,000).

- Whereas, Financier agrees to sign and seal the required agreements and provide the Financing proceeds totaling $100,000,000 within a reasonable timeframe (90 calendar days), based on the sale of stock via submission of the PROSPECTUS to interested parties that shall be qualified PRIVATE AND INSTITUTIONAL INVESTORS.

- Whereas, WVC and GVG have agreed that the first proceeds from the sale of shares shall be settled and affected no later than 7 to 10 banking days after receipt, authentication, verification and posting of the sale of stock as represented in the PROSPECTUS by delivery to the Client's securities trading account.

- Whereas, CLIENT affirms that they have discussed the terms and conditions of this transaction with their Board of Directors and Shareholders and is prepared to facilitate this transaction as required by the Financier.

- Whereas, the Financier has explained to Client that in providing the referenced undertakings they are all "SUBJECT TO" delivery of all appropriate documentation in standard format – Business Plan, Pro Forma Financials (inclusive of cash flow projections and balance sheet) for the issuance of the PROSPECTUS by its securities attorneys.

- Whereas, Client understands, as explained by Financier, that sale of stock via the PROSPECTUS is accomplished in a faster timeframe and to a wider and more affluent group of investors, both private and institutional if the Client executed a reverse merger and its stock was publicly traded;

DATED:  November 30th, 2011        DATED:  November 30th, 2011
Financier: World Venture Capital, Inc    Global Ventures Group, LLC

_____    _____
Title: CEO                       Title: Partner

(CLIENT)                               (WVC)

| | |
|---|---|
| TRANSACTION CODE: | WVCWVG1-CB110111-CBNY100LN75 |
| POLICY BATCH TRANSACTION NUMBER: | 113011-us175ms\| WVC_2*12/1 |
| STRUCTURED FINANCE AGREEMENT | EQUITY |

## FINANCING PROCEEDS Schedule
### (Hereinafter the "AGREEMENT")

Effective this November 30th, 2011, **Global Ventures Group, LLC** ("GVG" / "CLIENT"), with its offices located at 467 Middlesex Ave, Metuchen, NJ 08840 represented by Mr. Alfred Abiouness Jr., with Passport No (USA): 211088711 and Mr. Douglas Maslo, with Passport No (USA): _____ with full personal and corporate authority to execute and perform this Contract, hereinafter referred to as the **"(Client)"**;

**And**

World Venture Capital, Inc ("WVC") with their principal offices located at 620 Newport Center Dr, 11th fl, Newport Beach, CA 92660, represented by D.G. Brunton hereinafter referred to as the **"Financier"**. Client and Financier are also referred to as the "PARTIES".

NOW, THEREFORE, the Client and the Financier agree to the following terms and conditions of the Agreement which will be in effect from the date hereof to its Expiration Date as hereinafter set forth.

**FINANCING PROCEEDS Schedule**

Financier agrees to provide the Financing proceeds in the following schedule for payout of the Financing:

| | |
|---|---|
| Financing (Equity): | 40% of face value of stock issued ($250,000,000) |
| Amount: | $100,000,000 |

**Draw Schedule:  Post Closing fees paid to all parties - $3,980,000**

- ➤ Cash funds delivered to Client's securities account upon settlement of each stock sale.
- ➤ All fees to Broker Dealers, brokers and consultants are deducted prior to Client's receipt of net funds from the sale of stock.

(CLIENT)                                                                              (WVC)

**TRANSACTION CODE:**     WVCWVG1-CB110111-CBNY100LN75
**POLICY BATCH TRANSACTION NUMBER:** 113011-us175ms| WVC_2*12/1
**STRUCTURED FINANCE AGREEMENT**  EQUITY

---

## APPENDIX A

1. In the interest of timing (11/23/11 deadline), due to the availability of insurance policies from the source insurance companies, Client has requested that WVC provide advanced payment for deposits on policies as required by this agreement.

   WVC has agreed to provide for this advanced payment with the understanding that it shall be repaid by Wednesday 30th November 2011. This payment has been made on behalf of Client on 11/23/11.

   Wire for this replacement advance will be sent to: $275,000

**Wells Fargo Bank**

   **Bank:** Wells Fargo Bank
   **Branch:** Newport Beach

   **Branch #:** 949-675-5159
   **Branch Address:**
   3600 East Coast Hwy,
   Corona Del Mar, CA  92625
   **Wire Routing #:** 121000248
   **SWIFT#: WFBIUS65**
   **Account #:** 5688442705
   **Address:** 220 Newport Center Dr, ste 585, Newport Beach, CA 92660

Wire for balance of payment will be sent to: $275,000

**Wells Fargo Advisors**

Wells Fargo Bank
420 Montgomery Street
San Francisco, CA 94104
ABA: 121000248
Beneficiary: First Clearing, LLC
Acct. #: 4122023377
Further Credit: World Venture Capital, Inc, "5410-3800"

(CLIENT)                (WVC)

| | |
|---|---|
| **TRANSACTION CODE:** | WVCWVG1-CB110111-CBNY100LN75 |
| **POLICY BATCH TRANSACTION NUMBER:** | 113011-us175ms\| WVC_2*12/1 |
| **STRUCTURED FINANCE AGREEMENT** | EQUITY |

2. Client agrees to provide industry standard Pro-Forma Financial projections, inclusive of Cash Flow, Balance Sheet, Profit & Loss and "what-if" scenarios, in order for WVC to effectively present a viable offering to its investor base.

DATED:  November 30th, 2011
Financier: World Venture Capital, Inc
Signature:

DATED:  November 30th, 2011
Global Ventures Group, LLC
Signature:

Title: CEO

Title: Partner

**PAESANO | AKKASHIAN**

ATTORNEYS & COUNSELORS

132 North Old Woodward Avenue
Birmingham, Michigan 48009
P 248.792.6886
F 248.792.6885
www.paesanoakkashian.com

Anthony R. Paesano, Esq.
apaesano@paesanoakkashian.com

Brian M. Akkashian, Esq.
bakkashian@paesanoakkashian.com

Daniel S. Hoops, J.D., L.L.M., Of Counsel
Also Licensed in Florida

---

January 11, 2012

D.G. Brunton
World Venture Capital, Inc.
620 Newport Center Drive, 11th Floor
Newport Beach, California 92660

Re:     **Global Ventures Group, LLC**
        **Request for Information and Escrow Agreement**

Dear Mr. Brunton:

This letter is in follow up to our recent telephone conferences.   I have enjoyed our recent conversations and I look forward to working with you on this matter.

As you are aware, I have been retained by Global Ventures Group, LLC ("Global Ventures") to represent its interests associated with the *Memorandum of Understanding* dated November 16, 2011 (the "Memorandum") and the *Financing Agreement* dated November 30, 2011 (the "Financing Agreement"). I have had an opportunity to review the limited materials provided by you to my clients, so naturally, I have questions that need to be answered so I may advise my clients properly as it relates to not only your funding strategy, but how to structure the entity.

As a matter of good faith and fair dealing, I am requesting that World Venture place any and all amounts wired to Wells Fargo under the Financing Agreement in escrow and not deposited into any personal or business operating account until my client is satisfied with your responses to my requests for information and documents.  As with any prospective funding strategy, my clients need adequate assurances that World Venture can perform its duties and obligations under the Memorandum or the Financing Agreement, and that until further notice, in order to protect my client's interests, any funds paid to World Venture should be held in escrow.

Alternatively, I would ask that you provide me with confirmation that World Ventures used $250,000 of my client's engagement fee to acquire certain life insurance policies.  It is my understanding in speaking with my clients that, as part of your strategy, you needed to secure certain life insurance policies by depositing $250,000 by the end of 2011.  If this amount has indeed been deposited, I am requesting the information set forth above.  If not, I would ask that you honor Global Ventures request to place these funds in escrow.

In order to have a complete file, I am requesting copies of all applicable state registrations and registrations with FINRA or the SEC.  You had indicated that you are in the midst of the registration process with the SEC, so any applications or other similar documentation would suffice.

EXHIBIT

D

You have proposed leveraging the cash value of certain life insurance policies as security for any lender or investor, and you have represented that $250,000 of my client's payment to World Venture would be used to obtain these policies. I am requesting the name of the issuer or custodian of these policies and a contact person. Also, I am going to request that these policies not be obtained until further discussions between you and me, and the representative of the policy issuer or custodian because I need to ensure that the policies are properly assigned to my client's current entity or entity to be formed (which cannot be finalized until further information is provided).

As we discussed on the telephone, I am requesting a more detailed explanation on the scope of the proposed prospectus for the public offering of any stock or notes, and the means in which World Venture intends on filing the required registration statement for any proposed prospectus. I am curious to know whether World Venture has had past success in obtaining such approval using an investment strategy proposed in the Financing Statement. Finally, I am requesting that World Venture identify the underwriter for the prospectus, and the name and firm of any investment banker overseeing any public or private offering. Furthermore, it is my understanding that World Venture is responsible for the costs and completion associated with any public or private offering; however, I would appreciate written confirmation that this is indeed true.

Finally, Global Ventures is requesting that World Venture produce any and all contracts with broker/dealers, as referenced in the recitals of the Memorandum. It is imperative for my clients to have a level of security in World Venture's third-party agreements with market makers represented in the Memorandum.

Please forward to my attention confirmation that the funds deposited through Wells Fargo under the Financing Agreement are indeed placed in escrow, and identify the escrow agent so we may prepare the proper escrow agreement. Alternatively, please forward me the confirmation and account information related to any life insurance policies purchased with my client's $250,000 fee. I am copying Wells Fargo in on this correspondence so it may be aware of the concerns raised by Global Ventures.

Thank you for your anticipated cooperation.

Very truly yours,

PAESANO AKKASHIAN, PC

Anthony R. Paesano

cc:    Global Ventures Group, LLC
       Brian M. Akkashian, P.C.



## RESPONSE TO LETTER DATED: 01/12/12

Anthony R. Paesano, Esq                                           Date: 01/13/12
Paesano Akkashian
132 North Old Woodward Ave.
Birmingham, MI 48009

Dear Mr. Paesano,

Regarding your letter, dated January 12, 2012, titled: "Request for Information and Escrow Agreement", the responses to each point are as follows:

1. Regarding your request to have funds already sent by GVG placed in escrow, we are not sure under what premise you can ask this since this requirement is not represented in any of the agreements signed or previous understandings between GVG and WVC; please as we have, honor the agreements signed between both parties.
2. We confirm that World Venture Capital has made deposits on behalf of the transaction to acquire insurance policies for the benefit of Note holders as guaranteed repayment upon maturity of Notes that will be issued on behalf of GVG;
3. The application by our subsidiary World Venture Management via reverse merger into an existing public entity is in process and said reverse merger entity is up to date in its filings. Since GVG is only a minor part of this overall transaction with a much larger involvement by other private companies, we will reserve the right to keep this transaction confidential until such a time as the SEC has approved the application; We can confirm however that the public entity exists, is current in all filings and will trade on the NASDAQ Capital Markets;
4. As expressed to GVG in conversations previously, our relationships with insurance brokers and our ability to negotiate and obtain policies at a discount is confidential and proprietary to our company and therefore disclosure of said contacts and confidential relationships (for which we are also bound by "Non-Disclosure and Confidentiality" agreements) will not be forthcoming, however upon the sale of Notes, as policies are bought and placed into escrow, there is full disclosure of all policies in escrow, independently via the escrow agent and all necessary contacts will be provided at that time to the escrow company;
5. It seems from your requests and statements in your letter, you are not in complete understanding of how this financing structure works, the part the insurance policies play and when they are acquired; a simple conversation can remedy this;
6. The proposed financing structure is as a private placement whereby secured notes are sold to interested investors with a guarantee of repayment of principle upon maturity;
7. As a private placement, there is no "underwriter", however we have been discussing the possibility of either Morgan Stanley / Smith Barney and / or UBS taking on such a role in this particular transaction; if one "underwriter" is not established, we will sell the notes off privately via our current investment pool of over 350 investment firms, hedge funds and private investment / wealth managers;
8. This confirms that WVC is responsible for the costs and completion associated with the public offering of World Venture Management (WVM), but please note that the fact that WVM is going public has nothing to do with GVG and has been planned for over a year now.

EXHIBIT

E

9. Until you provide WVC with the information on the new GVG entity that will receive stock from EPL and assign said stock to WVM for the creation of the Notes, we cannot complete the prospectus and deliver said prospectus to the broker dealers that we have been discussing this transaction with, therefore no contracts are yet available. We cannot understand why it is taking so long to register a C-Corporation when this can effectively be done in minutes online, or simply convert their existing LLC into a C-Corp. Please advise.

We are awaiting information on the registered entity, inclusive of amount of shares, structure, appointed CEO, address, etc so that we may insert said information into the prospectus and deliver to our partners for response. If you have any questions, please do not hesitate to contact me.

Sincerely,

**D. G. Brunton**
**CEO**, World Venture Capital, Inc  |  **Chairman**, World Venture Group

# INVOICE

4000 MacArthur Blvd, West Tower
9th Fl - Newport Beach, CA 92660
US Securities

Broker Dealer

09.07.12  Investment Banking / Legal Fees:

| Client: | CBH | | Deposit: Wire | X | | Check | |

## CUSTOMER CONTACT

**CUSTOMER INFORMATION**

| Company: | GVG Cotton Bay Holdings, Inc |
| Client Type: | Financing - PPM-PUBCO |
| Contact: | Alfred E. Ablounes, Jr. |
| Address 1: | 113 Barksdale Professional Center |
| Address 2: | |
| City: Newark | State:  DE  Zip:  19711 | Country: USA |
| Email: | |
| Phone: 954-915-4616 | Fax: | Fax: |

**BILLING ADDRESS**                Same as Above [X]  Bus [X]  Res    Same as Above    X

| Company: | |
| Address 1: | |
| Contact: | |
| City: | State:  Zip: | State:  Zip: |
| Phone: | Fax: | Fax: |

## Item ORDER

| | Amt | Description of Service | | Item Cost | Extended Price |
|---|---|---|---|---|---|
| Item 1 | 1 | Investment Banking Fee (August 15th) | | $10,000.00 | $10,000.00 |
| Item 2 | 1 | Investment Banking Fee (Sept 15th) | | $10,000.00 | $10,000.00 |
| Item 3 | 1 | Retainer: Legal Consultation RE: case: Docket No. C-55-12 | | $7,500.00 | $7,500.00 |
| Item 4 | 1 | Promisory Note | | $25,000.00 | $25,000.00 |
| Item 5 | 0 | | | $0.00 | $0.00 |
| Item 6 | 0 | | | $0.00 | $0.00 |
| Item 7 | 0 | | | $0.00 | $0.00 |
| Item 8 | 0 | | | $0.00 | $0.00 |
| Item 9 | 0 | | | $0.00 | $0.00 |
| | | | | | $52,500.00 |

## SERVICE INFORMATION

| Service | | Additional Fees | Special Client Info |
|---|---|---|---|

| Business Plan | | | Trademark & Copyright | Client name:  GVG Cotton Bay Holdings, Inc |
| PPM | | | Incorporation | Message: |
| Loans | | X | SEC Filings | 1: |
| Equity | | X | Corporate / Legal Filings / Advice | 2: |
| Shell | | X | Investment Banking | 3: |
| Angel | | | | 4: |

| GAAP Audit | |
| Due Diligence | |
| Appraisals | |
| Reverse Merger | |

**Subsidiary Company**      X

| | Debt Financing |
| | Equity Capitalization |
| | Mezzanine |
| | Private Placement |

**Total Fees**

**Waived By**

a World Venture Group company

## MISC.

| Special Instructions/Misc: | x |
| | x |

RNS-NV
RNS-WSN
Delivery
Misc.

## ADDITIONAL FEES / TOTALS

| Description | Price/item | Extended Price |
|---|---|---|
| Based on FSA dated 03/25/12 sent to GVG | | |
| pg 4, Clause 17; pg 10, 5 (e) & (g) | | |
| balance $26,000 paid via Promissory Note | | |

| | | |
|---|---|---|
| Invoice/Source Code: | Set-up Fees | |
| | Total Discount | |
| | Subtotal | |
| | Taxes | |
| **NOTES:**  WIRE TO: Acc't Address: 220 Newport Center Dr, ste 585, Newport Beach, CA 92660 | | |
| Bank: Wells Fargo Bank | | |
| Branch: Newport Beach | Grand Total | $52,500.00 |
| Branch Address: 3600 East Coast Hwy, Corona Del Mar, CA  92825 | Deposit | $0.00 |
| Wire Routing #: 121000248 | SWIFT#: WFBIUS65 | Account #: 8639460402 | Sub-Account Name: WVG | Balance | $52,500 |

## PYMT

| Deposit Payment Method | | | | Terms: | | | | | | | | Terms: | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Check | AMEX | DIN | MC | | CB | | Exp Date | | VISA | DIN | MC | CB | | Exp Date |
| Credit Card # | - | . | | | | | | | | | | | | |

| WVC. | GVG Cotton Bay Holdings, Inc |
| AGENT | PRINT CUSTOMER NAME/TITLE |

| For Office Use Only | S.O. # | |
| | M.O. # | |

Your signature on the FSA & initial deposit makes this Commercial invoice a binding agreement between you and World Venture Group   By signing the FSA, this invoice validates that you agree to pay all amounts set forth above.  You further
agree that this invoice is non-cancelable and that all amounts set forth above are non-refundable. (09.07.12)



EXHIBIT

G

## INDEPENDENT CONTRACTOR AND
## FINANCIAL SERVICES AGREEMENT

This *Independent Contractor and Financial Services Agreement* (this "Agreement") is entered into on March 25, 2012 between (a) World Venture Group, Inc., its affiliates, assigns and agents, doing business at 4000 MacArthur Blvd, 9th Floor, Newport Beach, California 92660 ("Consultant"), and (b)         Cotton Bay Holdings, Inc., an entity to be formed as a Delaware corporation with a resident agent located at 113 Barksdale Professional Center in Newark, Delaware 19711-3258 ("Corporation"). Consultant and Corporation are collectively referred to herein as the "Parties".

WHEREAS, Corporation has expressed its desire to retain Consultant to provide a public vehicle (company) whereby the Corporation's shareholders will utilize the services of Consultant to acquire control of a public company and then change control of the public company, making Corporation the controlling entity by tendering the resignation of the public company's board of directors and the replacement of said board with an appointed board by Corporation. The public entity will then notify the Securities and Exchange Commission of its change of control by a Form 8-K filing and change of operations with a request for a new ticker symbol. Corporation will then retain a portion of shares of the public company and control of its board of directors. Consultant will facilitate this transaction by completing and filing all disclosure documents containing audited financial statements and significant legal disclosures with the oversight of Corporation's Counsel, and file the Form 8-K immediately upon completion of the transaction.

WHEREAS, Corporation and Contractor agree to incorporate into this Agreement the *Duties, Obligations and Compensation Schedule* attached hereto as Schedule A. The Parties agree that any written modification to Schedule A does not limit or restrict any duties, obligations or rights of the Parties under this Agreement.

WHEREAS, these recitals are not mere statements, but rather representations and warranties which are incorporated herein for the consideration stated below.

NOW THEREFORE, in consideration of the undertakings hereinafter contained, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.      **TERM OF THE AGREEMENT.**  This Agreement will become effective when executed by the Parties and shall continue until Contractor has complied with its duties and obligations identified on Schedule A, or a triggering event causing termination of the Agreement under Section 3, below. All provisions of this Agreement shall apply to all services and all periods of time in which Contractor renders services for Corporation.

2.      **TERMINATING THE AGREEMENT.** This Agreement shall terminate automatically within thirty (30) days upon the occurrence of any of the following events:

(a)      Contractor committing a material breach of this Agreement, and such breach is not cured to the satisfaction of Corporation within thirty (30) days of Corporation giving written  notice to Contractor of the material breach;

(b)      Contractor's actions or omissions expose Corporation to liability to third parties, and Contractor fails to cure or indemnify to Corporation's satisfaction the potential or actual liability within thirty (30) days of Corporation giving written notice to Contractor.

(c)      Corporation committing a material breach of this Agreement, and such breach is not cured to the satisfaction of Contractor within thirty (30) days of Contractor giving written notice to Corporation of the material breach;

1

GVG           WVG 

EXHIBIT

F

(c)   Either party giving written notice of its intention to terminate this Agreement provided that such notice is given no earlier than thirty (30) days from the expiration of the term identified in Paragraph 1, above. Basis of termination can only be due to a material breach of this Agreement that has not been cured by the defaulting party after an agreed upon 'period of cure' has been met and all reasonable attempts to cure have been exhausted.

3.   DUTIES UPON TERMINATION OR NON-EXTENSION OF THIS AGREEMENT.  In the event of termination of this Agreement, Contractor will work diligently and in good faith in transferring the services being provided by Contractor under this Agreement to another service provider chosen by Corporation or back to Corporation.

4.   RESTRICTIVE COVENANTS.  Contractor agrees that for a period of three (3) years from the date of termination of this Agreement, for whatever reason, it shall not directly or indirectly, either for its own account or as a shareholder or member of any corporation or limited liability company, respectively, or any other form of partnership or legal entity, solicit or attempt to solicit Eleuthera Properties Ltd, its officers, directors, subsidiaries or shareholders, and all known and disclosed prospects and future owners (members) of Cotton Bay.  The three (3) year time period of this covenant shall be tolled and extended, on a per diem basis, during any time Contractor conducts itself in breach of this Agreement.

CORPORATION AND CONTRACTOR ARE OF THE BELIEF THAT THE PERIOD OF TIME AND THE RESTRICTIONS SPECIFICED IN PARAGRAPH 4 ARE REASONABLE IN VIEW OF THE NATURE OF THE BUSINESS IN WHICH THE CORPORATION IS ENGAGED AND PROPOSES TO ENGAGE, THE STATE OF ITS PRODUCTS AND SERVICES DEVELOPMENT, AND CONTRACTOR'S KNOWLEDGE OF THIS BUSINESS; PROVIDED, HOWEVER, IF SUCH PERIOD OR SUCH RESTRICTIONS SHOULD BE ADJUDGED UNREASONABLE IN ANY JUDICIAL PROCEEDING, THEN THE PERIOD OF TIME SHALL BE REDUCED BY SUCH NUMBER OF MONTHS OR SUCH RESTRICTION SHALL BE MODIFIED BY ELIMINATION OF SUCH PORTION OF SUCH TIME OR RESTRICTIONS, OR BOTH, AS ARE DEEMED UNREASONABLE BY A COURT OF COMPETENT JURISDICTION, SO THAT THIS COVENANT MAY BE ENFORCED WITH SUCH RESTRICTIONS AND DURING SUCH PERIOD OF TIME AS IS ADJUDGED TO BE REASONABLE.

5.   CONFIDENTIALITY.  Contractor will not disclose or use, either during or after the term of this Agreement, any proprietary or confidential information of Corporation without Corporation's prior written permission except to the extent necessary to perform services on Corporation's behalf. Proprietary or confidential information includes the written, printed, graphic, or electronically recorded materials furnished by Corporation for Contractor to use; information belonging to the Corporation about whom the Contractor gained knowledge as a result of the Contractor's services to the Corporation. Contractor shall not be restricted in using any material that is publicly available, already in Contractor's possession, or known to Contractor without restriction, or that is rightfully obtained by Contractor from sources other than the Corporation. On termination of Contractor's services to Corporation, or at Corporation's request, Contractor shall deliver to the Corporation all materials in Contractor's possession relating to Corporation's business.

6.   PAYMENT.  In consideration for the services to be performed by Contractor, Corporation agrees to pay Contractor consistent with Schedule A.

7.   EXPENSES.  Contractor shall be responsible for all expenses incurred while performing services under this Agreement, unless otherwise agreed to by the parties in Schedule A. This includes license fees, memberships and dues; automobile and other travel expenses; meals and entertainment; insurance premiums; telephone; and all salary, expenses, and other compensation paid to employees or contract personnel that Contractor hires to complete the work under this Agreement, unless otherwise agreed to in writing by Corporation.

9.   MATERIALS.  Contractor will furnish all materials, equipment, and supplies used to provide the services required by this Agreement, unless otherwise agreed to in writing by Corporation.

2

GVG _AB_          WVG 

10.   INDEPENDENT CONTRACTOR STATUS. The parties agree that Contractor is an independent contractor, and that neither Contractor nor Contractor's employees nor contract personnel are, or shall be deemed to be, employees of Corporation.  Notwithstanding, Corporation and Consultant agree that this independent contractor status may be lost in the event Consultant or its employees or agents are appointed to serve on Corporation's Board of Directors or as an Officer, which in the event this occurs, Corporation and Consultant agree that such persons would be governed by Corporation's Bylaws and other applicable employment agreement(s).  In its capacity as an independent contractor, Contractor and Corporation agree to and represent the following:

(a)     Corporation shall cooperate with Contractor in providing Contractor with sufficient and confidential information and knowledge of Corporation's business in order for Contractor to perform under this Agreement. Corporation agrees to be responsible for all costs necessary in providing this information and knowledge to Contractor.

(b)     Contractor has the right and does fully intend to perform services for third parties during  the term of this Agreement.

(c)     Contractor has the sole right to control and direct the means, manner, and method by which the services required by this Agreement will be performed.

(d)     Contractor has the right to perform the services required by this Agreement at any place or location and at such times as Contractor may determine.

(e)     Contractor has the right to hire assistants as subcontractors or to use employees to provide the services required by this Agreement provided that such individuals have no less than six months of experience in providing services contemplated under this Agreement.

(f)     Contractor represents that those subcontractors or employees performing services under this Agreement on behalf of Contractor meet Contractor's conditions of employment.

(g)     The services required by this Agreement shall be performed by Contractor, or Contractor's employees or contract personnel, and Corporation shall not hire, supervise, or pay any assistants to help Contractor.

(h)     Neither Contractor nor Contractor's employees or contract personnel shall receive any training from Corporation in the professional skills necessary to perform the services required by this Agreement.

(i)     Neither Contractor nor Contractor's employees or contract personnel shall be required by Corporation to devote full time to the performance of the services required by this Agreement.

(j)     Contractor does not receive the majority of its annual compensation from Corporation.

The parties acknowledge and agree that Corporation is entering into this Agreement with reliance on the representations made by Contractor relative to its independent contractor status.

11.   PERMITS AND LICENSES. Contractor declares that Contractor has complied with all federal, state, and local laws requiring business permits, certificates, and licenses required to carry out the services to be performed under this Agreement. Corporation declares that it has also complied with all federal, state, and local laws requiring business permits, certificates, and licenses required to carry out the services to be performed under this Agreement.

3

GVG _AA_                     WVG 

12.    STATE AND FEDERAL TAXES. Corporation will not withhold FICA (Social Security and Medicare taxes) from Contractor's payments or make FICA payments on Contractor's behalf, or make state or federal unemployment compensation contributions on Contractor's behalf, or withhold state or federal income tax from Contractor's payments. Contractor shall pay all taxes incurred while performing services under this Agreement, including all applicable income taxes and, if Contractor is not a corporation, self-employment (Social Security) taxes. The parties acknowledge and agree that neither this Agreement nor the relationship created herein, shall constitute the creation of a taxable entity. Each of the Parties shall be responsible for making all required filings, including tax returns, with their respective governmental entities in which they are or may be respectively domiciled and for the payment of any and all taxes which may be assessed to either of them respectively. The Parties hereby authorize each other to disclose any information or details relative to such payments as may be required by law pursuant to a demand for disclosure legally made upon them by a legally authorized tax authority or by a valid court order and after written notice is received by such Party.

13.    FRINGE BENEFITS. Contractor understands that neither Contractor nor Contractor's employees or contract personnel are eligible to participate in any employee pension, health, vacation pay, sick pay, or other fringe benefit plan of Corporation.

14.    WORKERS' COMPENSATION. Corporation shall not obtain workers' compensation insurance on behalf of Contractor or Contractor's employees. If Contractor hires employees to perform any work under this Agreement, Contractor will cover them with workers' compensation insurance and provide Corporation with a certificate of workers' compensation insurance before the employees begin work.

15.    UNEMPLOYMENT COMPENSATION. Corporation shall make no state or federal unemployment compensation payments on behalf of Contractor or Contractor's employees or contract personnel. Contractor will not be entitled to these benefits in connection with work performed under this Agreement.

16.    INDEMNIFICATION/HOLD HARMLESS BY CONTRACTOR. Contractor, as an independent contractor, agrees to indemnify, defend, and hold harmless Corporation from any and all liability resulting from intentional or reckless acts or the acts of the employees or agents of Contractor.

17.    INDEMNIFICATION/HOLD HARMLESS BY CORPORATION. Corporation agrees to indemnify, defend and hold harmless Contractor from any and all liability resulting from intentional or reckless acts or the acts of the employees or agents of Corporation.

18.    EXCLUSIVE AGREEMENT. This Agreement and its attached Schedule A constitutes the entire agreement between the parties and represents the understanding of the parties regarding the subject matter in this Agreement, and *all prior agreements or understandings of the parties are revoked*. This Agreement may be amended or modified consistent with Paragraph 20, only. There are no agreements, restrictions, promises, warranties, covenants or other undertakings other than those expressly set forth in this Agreement and Schedule A.

19.    MODIFYING THE AGREEMENT. This Agreement may be modified only by a writing signed by both parties.

20.    DISPUTE RESOLUTION; ARBITRATION. Any and all disputes, controversies, or claims arising out of or in connection with or relating to this Agreement, or any breach or alleged breach thereof, and any claim that Corporation violated any state or federal statutes, common-law doctrine, or committed any tort with respect to Contractor shall, on the request of either party, be submitted to and settled by arbitration in the State of Delaware pursuant to the rules, then in effect, of the American Arbitration Association (or at any other place or under any other form of arbitration mutually acceptable to the parties involved). This Agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. Notice of the demand for arbitration shall be filed, in writing, with the other party to this Agreement within a reasonable time after the claim, dispute, or other matter in question arose where the party asserting the claim

4

GVG _AA_                      WVG 

should reasonably have been aware of it, but in no event later than the applicable Delaware statute of limitations. Cost of arbitration shall be shared equally by the parties, provided that each party shall pay for and bear the cost of his or her own experts, evidence, and attorney fees. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction to do so.

21.    APPLICABLE LAW. This Agreement will be governed by the laws of the State of Delaware.

22.    NOTICES. All notices or other communications required or permitted to be given to a party to this Agreement shall be in writing and shall be (a) personally delivered; (b) sent by registered or certified mail, postage prepaid, return receipt requested; or (c) sent by an overnight express courier service that provides written confirmation of delivery to Corporation at the addresses stated in the introductory paragraph to this Agreement. Each such notice or other communication shall be deemed given, delivered, and received on its actual receipt, except that if it is mailed in accordance with this paragraph, then it shall be deemed given, delivered, and received on the delivery date or the date on which delivery is refused by the addressee, in either case, in accordance with the U.S. Postal Service's return receipt. Any party to this Agreement may give a notice of a change of its address to the other party(ies) to this Agreement.

23.    NO PARTNERSHIP. This Agreement does not create a partnership relationship. Contractor does not have authority to enter into contracts on Corporation's behalf.

24.    ASSIGNMENT AND DELEGATION. Contractor may not assign or subcontract any rights or obligations under this Agreement without Corporation's prior written approval.

25.    COUNTERPARTS; ELECTRONIC OR FACSIMILE SIGNATURE. The Parties agree that this Agreement may be executed in counterpart with each part being merged into one set of signatures. The parties further agree that an electronic or facsimile signature shall be considered an original signature.

[SIGNATURES ON NEXT PAGE]

5

GVG _AA_



WVG

AGREED:

COTTON BAY HOLDINGS, INC.

By:  Alfred E. Abiouness, Jr.
Its    Chairman of the Board
Dated:  April 25, 12

**WORLD VENTURE GROUP, INC.**

By: D.G. Brunton
Its: Chief Executive Officer
Dated:  04/25/12

6

GVG _AA_                         WVG

## SCHEDULE A

## DUTIES, OBLIGATIONS AND COMPENSATION SCHEDULE

This *Duties, Obligations and Compensation Schedule* (the/this "Schedule") is made between World Venture Group, Inc.,, its affiliates, assigns and agents, doing business at 4000 MacArthur Blvd, 9th Floor, Newport Beach, California 92660 ("Consultant"), and Cotton Bay Holdings, Inc., an entity to be formed as a Delaware corporation with a resident agent located at 113 Barksdale Professional Center in Newark, Delaware 19711-3258 ("Corporation").

WHEREAS, Corporation and Contractor have executed concomitant with the execution of this Schedule an *ndependent Contractor and Financial Services Agreement* (the "Agreement") wherein the parties agreed that during the term of the Agreement, Corporation's and Contractor's respective duties and obligations, and Contractor's compensation for services rendered would be governed by this Schedule.

WHEREAS, Corporation and Contractor agreed that it is in their mutual best interests to have a duties, obligations and compensation schedule that can account for fluctuations in financial circumstances of the parties and to allow for fluidity of service while adjusting compensation in a fair and equitable manner.

WHEREAS, these recitals are not mere statements, but rather representations and warranties which are incorporated herein for the consideration stated below.

NOW THEREFORE, in consideration of the undertakings hereinafter contained, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.  **INCORPORATION INTO THE AGREEMENT.** This Schedule and any and all subsequent modifications made consistent with Paragraph 2, below, shall be incorporated into the Agreement as Schedule A, and for all intents and purposes, shall be considered completely integrated into the Agreement as if fully stated therein.

2.  **MODIFICATION OF SCHEDULE.** The Agreement and this Schedule constitute the entire agreement between the parties related to duties, obligations and compensation for those services provided by Contractor to Corporation, and may be modified only by a writing signed by both parties.

3.  **DUTIES AND OBLIGATIONS OF CONTRACTOR.** Contractor agrees to exercise the following duties and obligations in a professional manner consistent with industry standards:

### STOCK ACQUISITION PROCESS

(a)    Consultant has represented to Corporation that a public corporation (the "Public Company") fully compliant with the standards promulgated by the United Stated Securities and Exchange Commission ("SEC") has expressed its intention of merging with Corporation with Corporation being the surviving entity through a publicly-traded entity (the "Transaction"). Upon execution of this Agreement, Consultant will facilitate execution of the necessary confidentiality and nondisclosure between the Public Company and Corporation in order to commence with due diligence common in the type of transaction contemplated under this Agreement.

(b)    Consultant shall ensure that immediately prior to the Transaction that the Public Company has no assets, is free of any liabilities, is current in all filings required by the SEC and that the stock being acquired is free and clear of any claims or any restrictions on transfer including any hold-back stockholder claims. Consultant shall further ensure that the Public Company's officers and directors resign in favor of officers and directors designated by Corporation.

7



GVG *AA*                    WVG

(c)     Upon Consultant's performance of Sections 3(a) and 3(b), above, Corporation shall have authority over the issuance of the Public Company Shares with the Corporation's pre-acquisition shareholders being issued, on a pro-forma basis, ten-percent (10%) of the authorized common shares associated with the Public Company Shares. The remaining common shares of the Public Company Shares being issued to Consultant or its designees, and held by Consultant in a manner consistent with the spirit and intent of this Agreement and Consultant's duties and obligations to Corporation hereunder. Also, Consultant and Corporation note all shares held by both Corporation's shareholders and Consultant will be subject to SEC Rule 144A and both parties are considered SEC Section 16 insiders for purpose of control person classification.

(d)     Consultant shall take any and all necessary steps to facilitate the Transaction, including but not limited to the following:

(i)     Change of control submitted to the SEC using Form 8K including, but not limited to, Board of Director Resolution approving transaction, Subscription Agreements, Stockholder Resolution, Employee Stock Option Plan, Resignation Letter and Stock Tender Letter;

(ii)     Change of business status to operating corporation submitted to SEC using Form 8K including, but not limited to, Corporation provided business description, GAAP audited financials (if needed) or other material agreements for Corporation to complete form 8K;

(iii)     Regulation D offering using Corporation supplied information at a set price needing thirty-five or more shareholders with one hundred fifty thousand shares (bought or transferred) needed for registration;

(iv)     Registration statement submitted to the SEC using form S-1 including, but not limited to, Corporation provided list of selling shareholders from regulation D offering (names and number of shares owned) for Consultant to complete form S-1;

(v)     Engage stock transfer agent and market maker to file 15c-211 with FINRA for ticker providing all the information in the S-1 registration statement filed with the SEC;

(vi)     Consult with Corporation during the review process implemented by the SEC;

(vii)     Respond to questions, comments or other issues raised by the Financial Industry Regulatory Authority ("FINRA");

(viii)     List Corporation on either the NASDAQ, NYSE or AMEX; and

(ix)     Take any other action Consultant deems proper and necessary to perform the agreed upon services under the Agreement.

<u>NOTE ISSUANCE THROUGH CORPORATION</u>

(e)     Consultant shall arrange for the creation and issuance (with oversight and approval of Corporation's counsel) of secured convertible notes, to be sold on a best efforts basis, totaling Three Hundred Million US Dollars ($300,000,000.00) in par value to Qualified Institutional Buyers or Accredited Investors, with net proceeds of One Hundred Million US Dollars ($100,000,000.00) for the purpose of project financing (the "Notes"). Those that purchase the Notes are referred to herein as the "Noteholders".

8



GVG _AA_          WVG _____

(f)     Contractor shall draft for Corporation's counsel's review and approval the appropriate and necessary Regulation D offering documents, i.e. a Private Placement Offering Memorandum (the "PPM"), and/or prospectus consistent with those standards implemented by the SEC (the "Prospectus").

(g)     Contractor shall acquire insurance policies backing the Notes in an amount equal to 150% of the face amount of the Notes, and pay call option fee(s) on policies which are identified and represented in the PPM and/or Prospectus (the "Insurance Policies"). Consultant shall either produce evidence of payment associated with the initial call option, and any other timeframes, conditions or other descriptive information related to the call option. Consultant agrees to full transparency acceptable to Corporation with regard to the Insurance Policies prior to approval of the Private Placement Memorandum..

(h)     Contractor shall be responsible for coordinating with Broker-Dealer firms for purpose of purchasing the Notes, creating the market and selling the Notes through the proper PPM and/or Prospectus.

(i)     Contractor shall take any and all necessary steps to retain the services of a licensed, bonded and insured escrow agent ("Escrow Agent") suited to retain the $300,000,000.00 balance following the sale of the Notes and distribution to Corporation, as provided for in Section 3(d), above. Contractor shall coordinate efforts with Escrow Agent in maintaining the premiums on the Insurance Policies for the life of the Notes and pay into escrow the matured insurance policy benefits to provide the return of the face value of Notes, plus a ten-percent (10%) return to the Noteholders (which shall be memorialized in a Board of Director's Resolution). Corporation, Consultant and Escrow Agent shall execute an escrow agreement wherein the parties agree that, among other things, (i) Corporation shall receive, as proceeds, forty-percent (40%) of the face value of each Note (up to $100,000,000), (ii) Escrow Agent shall pay commissions, consulting fees and other operational expenses on an agreed upon basis by Consultant and Corporation out of the account held by Escrow Agent, (iii) out of escrowed proceeds, Consultant shall maintain premium payments on the Insurance Policies, and (iv) Consultant shall retain the equivalent of an 8.5% annual coupon payment, in cash from escrowed proceeds, for outstanding Notes for the first three (3) years from issuance. The annual interest payment obligation transfers to Corporation after the third year from issuance (*see* Section 5(c)).

(j)     Contractor shall take any and all other action it deems necessary based on its education, training and experience to perform its duties under the Agreement and this Schedule.

(k)     Contractor agrees to vote its shares in the public entity on any vote related to the seats of the Board of Directors in such manner where Corporation's designees constitute the majority of the Board of Directors and the Chairman of the Board until such time Corporation elects otherwise.

4.     COMPENSATION OF CONTRACTOR.  Corporation agrees that during the term of the Agreement, Corporation will pay Contractor the following consideration and expenses:

(a)     Professional Fees and Call Option Fees:  $250,000.00 shall payable by Corporation upon an approved PPM to Consultant for 'Call Option' fees to cover available insurance policies for this transaction. Corporation and Contractor agree that a condition precedent to the enforceability of the Agreement and this Schedule is the execution of a promissory note in the amount of $25,000.00 in favor of Consultant, which reflects a deferred payment amount (the "Note"). The Parties agree that the Note shall be merged into this Agreement constituting a fully integrated document.

(b)     Fees for Facilitation Of The Transaction:  $150,000.00 payable from the Corporation for its ownership of 10% of the acquisition of a publicly traded entity, payable upon execution of this Agreement, and Consultant providing adequate documentation and information to Corporation's Counsel, subject to Counsel's execution of a confidentiality, non-disclosure and non-circumvent agreement disclosing the corporate status and organization of the public entity.

9

GVG _AA_                        WVG 

(c)     Board of Director Seats.  Consultant shall nominate two (2) individuals to Corporation's Board of Directors conditioned upon Consultant performing its duties and obligations under Section 3(a) through 3(d), above. Consultant agrees that the individuals appointed are subject to a majority approval of the Board of Directors of Corporation, which shall not be unreasonably withheld.

(d)     Registration Rights. Consultant shall be granted piggy-back registration rights with respect to all shares of the Corporation issued and issuable on the exercise of any warrants issued in connection with the transaction on the condition that Consultant fully performs its duties and obligations under Section 3(a) through 3(k), above.

5.     DUTIES AND OBLIGATIONS OF CORPORATION.

(a)     Corporation shall provide its Business Plan/Executive Summary complete with Pro Forma financial statements and projections, breakdown of all use of funds, monthly draw schedule, agreements to purchase (land or property), M&A agreements, organizational formation documents, title documents, escrow instructions, permits (construction and all building permits), construction plans, design plans, permits, licenses, government approvals and all other reasonably required documents in a timely and orderly fashion.

(b)     Corporation agrees to indemnify and hold Consultant harmless for any interest payments associated with the Notes for those years beyond the fourth year of issuance (provided the Notes are not converted as contemplated under the Agreement and this Schedule).

(c)     Corporation agrees to pay all expenses related to its duties and obligations in Section 5(b), above, and in responding to any and all business related inquiries by the SEC or FINRA.

(d)     Corporation shall retain its own legal counsel, certified public accountants, financial advisors and other professionals it deems necessary to perform its duties and obligations under the Agreement and this Schedule.

(e)     Corporation shall be responsible for the audit fees (if required), and all expenses related to SEC and FINRA responses. Corporation will also be responsible for all filing fees, including EDGAR/XBRL fees, both up to and after the filing of the Change of Control Form 8-K with the SEC.

(f)     Corporation agrees to assume any and all liabilities of the pre-acquisition private corporation upon acquisition of the Public Company.

(g)     Corporation will be responsible for all ordinary out-of-pocket expenses including long distance telephone transmission charges, duplication costs, and mail courier and overnight delivery fees. Corporation will be responsible for travel and accommodation expenses incurred by Consultant including Corporation's recording, documentation preparation, inspection and closing fees incurred in the process of funding that are prepared for Corporation, prior to incurring such expenses, and upon approval by the Corporation's Board of Directors and the Bylaws of the Corporation.


[SIGNATURES ON NEXT PAGE]


10



GVG _AA_                    WVG

AGREED:

COTTON BAY HOLDINGS, INC.


By:  Alfred E. Abiouness, Jr.
Its:   Chairman of the Board
Dated:  April 25, 12


**WORLD VENTURE GROUP, INC.**


By: D.G. Brunton
Its: Chief Executive Officer
Dated:  04/25/12

11

GVG _____                    WVG _____

# INVOICE

**WORLD VENTURE GROUP**

4000 MacArthur Blvd, West Tower
9th Fl - Newport Beach, CA 92660
US Securities

Broker Dealer

10.12.12   Investment Banking / Legal Fees:

| Client: | CBH | Deposit: Wire | X | Check | |

## CUSTOMER INFORMATION

**CUSTOMER CONTACT**

| | |
|---|---|
| Company: | GVG Cotton Bay Holdings, Inc |
| Client Type: | Financing - PPM-PUBCO |
| Contact: | Alfred E. Abiouness, Jr. |
| Address 1: | 113 Barksdale Professional Center |
| Address 2: | |
| City: Newark | State: DE  Zip: 19711  Country: USA |
| Email: | |
| Phone: 954-915-4616 | Fax: | Fax: |

**BILLING ADDRESS**   Same as Above XXX  Bus  XXXX  Res  Same as Above  X

| | |
|---|---|
| Company: | |
| Address 1: | |
| Contact: | |
| City: | State: Zip: | State: Zip: |
| Phone: | Fax: | Fax: |

## Item ORDER

| | Amt | Description of Service | Item Cost | Extended Price |
|---|---|---|---|---|
| Item 1 | 1 | Investment Banking Fee (October 16th) | $10,000.00 | $10,000.00 |
| Item 2 | 1 | Road Show Fee (1st show - TBD) | $15,000.00 | $15,000.00 |
| Item 3 | 1 | | | |
| Item 4 | 1 | | | |
| Item 5 | 0 | | $0.00 | $0.00 |
| Item 6 | 0 | | $0.00 | $0.00 |
| Item 7 | 0 | | $0.00 | $0.00 |
| Item 8 | 0 | | $0.00 | $0.00 |
| Item 9 | 0 | | $0.00 | $0.00 |
| | | | | $25,000.00 |

## SERVICE INFORMATION

| Service | | Additional Fees | Special Client Info |
|---|---|---|---|
| Business Plan | | Trademark & Copyright | Client name: GVG Cotton Bay Holdings, Inc |
| PPM | | Incorporation | Message: |
| Loans | X | SEC Filings | 1: |
| Equity | X | Corporate / Legal Filings / Advice | 2: |
| Shell | X | Investment Banking | 3: |
| Angel | | | 4: |

| | |
|---|---|
| GAAP Audit | |
| Due Diligence | |
| Appraisals | |
| Reverse Merger | |

**Subsidiary Company**

| Debt Financing | X |
| Equity Capitalization | |
| Mezzanine | |
| Private Placement | |

**WORLD VENTURE CAPITAL**
a World Venture Group company

Total Fees
Waived By

## MISC.

| Special Instructions/Misc: | x | RNS-NV |
| | x | RNS-WSN |
| | | Delivery |
| | | Misc. |

## ADDITIONAL FEES / TOTALS

| Description | Price/item | Extended Price |
|---|---|---|

| | | |
|---|---|---|
| Set-up Fees | | |
| Invoice/Source Code: | Total Discount | |
| | Subtotal | |
| NOTES: WIRE TO: Acc't Address: 220 Newport Center Dr, ste 585, Newport Beach, CA 92660 | Taxes | |
| Bank: Wells Fargo Bank | Grand Total | $25,000.00 |
| Branch: Newport Beach | Deposit | $0.00 |
| Branch Address: 3600 East Coast Hwy, Corona Del Mar, CA  92625 | Balance | $25,000 |
| Wire Routing #: 121000248 | SWIFT#: WFBIUS65 | Account #: 8839460402 | Sub-Account Name: WVG | | |

## PYMT

| Deposit Payment Method | | Terms: | | Terms: | |
|---|---|---|---|---|---|
| Check | AMEX | DIN | MC | CB | Exp Date | VISA | DIN | MC | CB | Exp Date |
| Credit Card # | | | | | | | | | | |

| WVC. | GVG Cotton Bay Holdings, Inc |
|---|---|
| AGENT | PRINT CUSTOMER NAME/TITLE |

| For Office Use Only | S.O. # |
| | M.O. # |

Your signature on the FSA & initial deposit makes this Commercial Invoice a binding agreement between you and World Venture Group.  By signing the FSA, this invoice validates that you agree to pay all amounts set forth above.  You further agree that this invoice is non-cancelable and that all amounts set forth above are non-refundable. (10.12.12)



EXHIBIT
H
tabbies

# INVOICE

WORLD VENTURE GROUP

4000 MacArthur Blvd, West Tower
9th Fl - Newport Beach, CA 92660
US Securities

Broker Dealer

11.21.12  Investment Banking / Legal Fees:

| Client: | CBH | | Deposit: Wire | X | | Check | |

## CUSTOMER INFORMATION

**CUSTOMER CONTACT**

| | |
|---|---|
| Company: | GVG Cotton Bay Holdings, Inc |
| Client Type: | Financing - PPM-PUBCO |
| Contact: | Alfred E. Ablouness, Jr. |
| Address 1: | 113 Barksdale Professional Center |
| Address 2: | |
| City: Newark | State:  DE  Zip:      19711      Country: USA |
| Email: | |
| Phone: 954-915-4616 | Fax:                          Fax: |

**BILLING ADDRESS**   Same as Above [ ]  Bus [ ]  Res [ ]  Same as Above  X

| | |
|---|---|
| Company: | |
| Address 1: | |
| Contact: | |
| City: | State:    Zip:                State:    Zip: |
| Phone: | Fax:                         Fax: |

## Item ORDER

| | Amt | Description of Service | Item Cost | Extended Price |
|---|---|---|---|---|
| Item 1 | 1 | Investment Banking Fee (November 16th) | $10,000.00 | $10,000.00 |
| Item 2 | 1 | Road Show Fee (1st show - Miami) PAID | $0.00 | $0.00 |
| Item 3 | 1 | Road Show Fee (2nd show - West Palm Beach) | $15,000.00 | $15,000.00 |
| Item 4 | 1 | Road Show Fee (3rd Show - New York) | $15,000.00 | $15,000.00 |
| Item 5 | 1 | Road Show Fee (4th show - Los Angeles) | $15,000.00 | $15,000.00 |
| Item 6 | 0 | | $0.00 | $0.00 |
| Item 7 | 0 | | $0.00 | $0.00 |
| Item 8 | 0 | | $0.00 | $0.00 |
| Item 9 | 0 | | $0.00 | $0.00 |
| | | | | $55,000.00 |

## SERVICE INFORMATION

**Service**

- [ ] Business Plan
- [ ] PPM
- [ ] Loans
- [ ] Equity
- [X] Shell
- [X] Angel

- [ ] GAAP Audit
- [ ] Due Diligence
- [ ] Appraisals
- [ ] Reverse Merger

**Total Fees**

**Waived By**

**Additional Fees**

- Trademark & Copyright
- Incorporation
- SEC Filings
- Corporate / Legal Filings / Advice
- Investment Banking
- Road Show

| X | Debt Financing |
| | Equity Capitalization |
| | Mezzanine |
| | Private Placement |

**Special Client Info**

Client name:   GVG Cotton Bay Holdings, Inc
Message:
1:
2:
3:
4:

**Subsidiary Company**

X

WORLD VENTURE CAPITAL
a World Venture Group company

## MISC.

Special Instructions/Misc:                x
                                          x

- [ ] RNS-NV
- [ ] RNS-WSN
- [ ] Delivery
- [ ] Misc.

## ADDITIONAL FEES / TOTALS

| Description | Price/Item | Extended Price |
|---|---|---|
| | | |
| | | |
| | | |
| | Set-up Fees | |
| Invoice/Source Code: | Total Discount | |
| | Subtotal | |
| | Taxes | |
| NOTES:   WIRE TO: Acc't Address: 220 Newport Center Dr, ste 585, Newport Beach, CA 92660 | Grand Total | $55,000.00 |
| Bank: Wells Fargo Bank | Deposit | $0.00 |
| Branch: Newport Beach | Balance | $55,000.00 |
| Branch Address: 3600 East Coast Hwy, Corona Del Mar, CA  92625 | | |
| Wire Routing: 121000248 | SWIFT#: WFBIUS6S | Account #: 6839460402 | Sub-Account Name: WVG | | |

## PYMT

| Deposit Payment Method | | | Terms: | | | | | | Terms: | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Check | AMEX | DIN | MC | CB | Exp Date | | VISA | DIN | MC | CB | Exp Date |

Credit Card #

WVC.
AGENT

GVG Cotton Bay Holdings, Inc
PRINT CUSTOMER NAME/TITLE

For Office Use Only    S.O. #
                       M.O. #

Your signature on the FSA & initial deposit makes this Commercial Invoice a binding agreement between you and World Venture Group.  By signing the FSA, this invoice validates that you agree to pay and agree that this invoice is non-cancelable and that all amounts set forth above are non-refundable. (11.21.12)

**EXHIBIT I**

# COTTON BAY
## HOLDINGS

December 11, 2012

D. Geno Brunton
World Venture Capital, Inc.
620 Newport Center Drive, 11th Floor
Newport Beach, California 92660

RE:     NOTICE OF TERMINATION AND DEMAND TO CURE

Dear Mr. Brunton:

This letter is being sent pursuant to Section 2(a) of the enclosed Independent Contractor and Financial Services Agreement dated March 25, 2012 (the "FSA"). Notwithstanding this termination, World Venture Group, Inc., its affiliates, assigns and agents (collectively "WVG") are on notice of its continuing obligation of confidentiality under Section 5. It is our understanding that you are disclosing contents of the FSA and your performance (or lack thereof) with third-parties. This is a breach of the FSA, and thus we are demanding that you cease and desist from any further communications.

Furthermore, to the extent your breaches are not cured within thirty days, Cotton Bay Holdings, Inc. ("CBH") is demanding that WVG deliver to CBH all materials in WVG's possession related to CBH's business pursuant to Section 5 of the FSA, and transfer all services provided by WVG back to CBH, including but not limited to, the insurance policies and/or call option fees purchased pursuant to Section 3(g) of Exhibit A to the FSA.

CBH's accounting reflects the following payments to WVG under Section 4 of Exhibit A to the FSA: (a) $275,000 for the original "call option" fees from the original November 2011 Financial Services Agreement, (b) $250,000 for additional "call option" fees pursuant to the FSA, (c) $150,000 for its ownership of "10% of the acquisition of a *publicly traded entity* and (d) $90,000 towards investor presentations, of which $9,000 has been paid to Alan Stone of Alan Stone & Company, LLC. WVG never purchased the call option fees or the insurance policies that were to serve as collateral for the bond offering. WVG has refused to provide any accounting.

WVG has thirty days to cure this default by either providing title and right to the call options or the policies, or providing verifiable evidence of the acquisition of the call options or policies and in turn transferring them to CBH pursuant to Section 5 and/or Section 3(g) of Exhibit A to the FSA. To the extent WVG fails to convey these assets to CBH, CBH is placing WVG on notice of its obligation to report this matter to the United States Securities and Exchange Commission ("SEC") Department of Enforcement. CBH

1314 East Las Olas Boulevard, Suite 1036, Fort Lauderdale, FL 33301

p: 954-607-1944 / f: 954-357-2266 / www.cottonbay-holdings.com



EXHIBIT

J

# COTTON BAY
## HOLDINGS

has made representations to third-parties that it purchased these securities through WVG, and that such securities are to be used for the benefit of CBH. If these securities were not purchased, and WVG refuses to refund CBH those amounts paid to purchase these securities, we will need to make the proper disclosure with the SEC and explore with our legal counsel our obligations in reporting this matter to the SEC Department of Enforcement.

CBH submits that WVG is in breach of the FSA because, among other things, it failed to acquire a publicly traded entity. Rather, WVG acquired a publicly reporting company, and this company was not "free of any liabilities" and was not compliant with its reporting requirements, as was required under Section 3(a) of Exhibit A to the FSA. In order to cure this breach, CBH is demanding that WVG provide an accounting of the underlying transaction associated with the acquisition of Tranquility, Inc., and take any and all necessary action to ensure that the entity is publicly-traded and its reporting requirements, primarily its financial reporting requirements, are current and accurate. Our Chief Financial Officer, Kevin Berth, requested this information on December 10, 2012, and you advised him that it would not be produced.

WVG failed to arrange for the creation and issuance of secured convertible notes, failed to retain the services of licensed, bonded and insured escrow agent, and failed to draft the necessary offering documents for our counsel's review (rather, we expended considerable money for our counsel to prepare these documents due to your lack of attention to the matter). CBH is demanding that WVG cure these breaches by creating and issuing the secured convertible notes, securing the services of an escrow agent and reimbursing CBH for attorney fees and costs in the amount of $35,000.

WVG is of the opinion that it is entitled to 90% of the issued and outstanding common shares of CBH. The FSA does not state that WVG is entitled to these shares; rather, the FSA specifically states in Section 3(c) of the FSA that, "[t]he remaining common shares of the Public Company Shares being issued to Consultant or its designees, and held by Consultant in a manner consistent with the spirit and intent of this Agreement and Consultant's duties and obligations to Corporation hereunder." It is clear from this correspondence that WVG has failed to act in a manner consistent with the spirit and intent of this Agreement, and furthermore, you have received shares of common stock of CBH without ever providing an accounting of payment or other consideration for those shares. CBH reserves its right to seek a judicial order compelling the conveyance of any shares issued to WVG pursuant to the FSA back to CBH, assuming that you provide evidence of funding the subscription for the 3,531,990 shares within two days of executing the Subscription Agreement. As for the August 1, 2012 Subscription Agreement for 66,263,780 Shares, CBH never issued those shares because

# COTTON BAY
## HOLDINGS

you admitted that the subscription was never funded pursuant to Section A of the Subscription Agreement.

WVG has expressed its refusal to produce any accounting on the use of funds paid to WVG for CBH's benefit, including but not limited to the use of funds in acquiring the entity and paying any liabilities. Mr. Berth and Mr. Paesano have both expressed that this information is necessary in order for CBH to file complete reports with the SEC. Your refusal to do so constitutes an intentional act that might cause damage to CBH. You are on notice that to the extent such damages accrue due to your failure to provide this accounting, CBH will exercise its rights under Section 16 of the FSA in seeking indemnification from WVG.

Finally, WVG is reminded that it "…[agreed] to vote its shares in the public entity on any vote related to the seats of the Board of Directors in such manner where [CBH's] designees constitute the majority of the Board of Directors and the Chairman of the Board until such time [CBH] elects otherwise." WVG is on notice that this provision is in full force and effect, and WVG's threats to change the Board of Directors or take any other action in violation of this FSA or the Bylaws of the corporation will not be tolerated.

CBH has copied this correspondence to Randall Farr of ICON because we are of the opinion that to the extent we need to pursue legal remedies against WVG, Mr. Farr was acting as an agent of WVG in soliciting your services. We have also copied Desmond Brunton in on this notice due to your past representations that he is an officer and/or director of WVG and someone who was facilitating certain services under the FSA.

We look forward to curing the defaults set forth in the FSA. However, WVG has failed to provide CBH with any assurance of its willingness to do so, and thus it is imperative that WVG act swiftly to remedy its defaults.

Respectfully,

Alfred E. Abiouness, Jr.
Chairman of the Board

Cc:     Cotton Bay Holdings Board of Directors
        Kevin J. Berth, Chief Financial Officer
        P. Desmond Brunton, World Venture Capital
        Randall Farr, ICON
        Paesano/Akkashian

EX-9.03 8 c.htm EXHIBIT 9.03 ASSET PURCHASE AND LIMITED LIEN RELEASE AGREEMENT

## ASSET PURCHASE AND LIMITED LIEN RELEASE AGREEMENT

This Asset Purchase and Limited Lien Release Agreement (this "Agreement") is made and entered into this 10th day of January, 2013, by and between (a) Global Ventures Group, LLC, a Florida limited liability company doing business at 110 North Federal Highway, Unit 807 in Fort Lauderdale, Florida 33301 ("Seller"), (b) Cotton Bay Holdings, Inc., a Delaware corporation doing business at Las Olas Boulevard, Suite 1036 in Fort Lauderdale, Florida 33301 ("Buyer"), (c) Alfred Abiouness, Sr. with a mailing address of 4410 East Beach Drive, Norfolk, Virginia ("Abiouness"), and (d) RG Development, Inc., a Delaware corporation doing business at 364 East Main Street, Suite 205 in Middleton, Delaware 19709 ("RG Development")(collectively the "Parties" or individually a "Party").

WHEREAS, Seller owns all rights, title and interest to 800 shares of Class A Common Shares in Eleuthera Properties Limited (the "Eleuthera Stock") subject to the lien rights of Abiouness and RG Development, set forth below. These 800 shares constitute 12.3% of all authorized shares of Eleuthera Stock in which Seller has the exclusive right to acquire through the Master Agreement between Global Ventures and Eleuthera Properties Limited ("Eleuthera") dated on or about May 22, 2012;

WHEREAS, the Parties have entered into a Financing Agreement dated August 1, 2012 and an Assignment of Rights and Title Agreement dated August 1, 2012 and amended on November 6, 2012 and January 10, 2013, setting forth their respective rights, duties and obligations associated with the future conveyance of shares of the Eleuthera Stock from Seller to Buyer (the "Financing and Assignment Agreements"). The Financing and Assignment Agreements are to be interpreted consistent with the Parties' rights, duties and obligations hereunder, and the agreements shall be considered merged herein constituting a fully integrated contract under Delaware law. To the extent the Parties' respective rights, duties and obligations are not modified or amended herein, their respective rights, duties and obligations under the Financing and Assignment Agreements shall remain in full force and effect.

WHEREAS, Buyer intends to purchase and Seller intends to sell, pursuant to this Agreement, 800 shares of the Eleuthera Stock (the "Acquired Eleuthera Stock") free of any encumbrances, and in doing so, Abiouness and RG Development, acknowledging the consideration hereunder as being adequate, agree to release their respective liens to the Acquired Eleuthera Stock.

WHEREAS, the Parties agree that these recitals are not mere statements, but material representations relied upon in entering into this Agreement.

NOW, THEREFORE, in consideration of the mutual promises, covenants and agreements herein contained, the parties agree as follows:

## ARTICLE ONE: EXHIBITS & INTERPRETATION

1.1 **Exhibits.** The attached exhibits (individually, "Exhibit" or collectively, "Exhibits") and any attached schedules are expressly incorporated into this Agreement in their entirety by virtue of this reference. Any reference to an "attached" Exhibit shall be deemed to be the equivalent of the formal recitation that such Exhibit "is attached to this Agreement and incorporated into this Agreement in its entirety by virtue of this reference." For the sake of brevity and clarity, phrases such as "as it may be amended from time-to-time" need not be expressly used in conjunction with any reference to any Exhibit in the text of this Agreement and no reference to subsequent amendment, if any, is required. Initial Exhibits are attached to this Agreement as a matter of convenience. No otherwise valid Exhibit to this Agreement shall be deemed invalid by virtue of the fact that it has become detached to this Agreement or any copy of it. In the case of any actual, perceived or asserted conflict between the terms of the Agreement and any Exhibit, the terms of the applicable Exhibit shall control unless expressly subordinated pursuant to the language of this Agreement.

1.2 **Use Of Pronouns.** Wherever the singular is used, it shall include the plural, and the masculine gender shall include the feminine and neuter genders and vice versa, whenever the context so requires.

1.3 **Entire Agreement.** This Agreement, when read consistent with the Financing and Assignment Agreement, constitutes the entire agreement between the Parties pertaining to the subject matter hereof and supersedes all prior arrangements, understandings, negotiations and discussions, whether oral or written, of the Parties. No amendment, supplement, modification, waiver or termination of this Agreement shall be binding unless executed in writing by the Party against whom enforcement is sought. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a



EXHIBIT
K

waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

1.4 **Joint Drafting And Negotiation**. All the Parties to this Agreement expressly agree that they have had an opportunity to participate in the drafting, preparation and negotiation of this Agreement. Each of the Parties expressly acknowledges such participation and negotiation in order to avoid the application of any rule construing contractual language against the drafter thereof and agrees that the provisions of this Agreement shall be construed without prejudice to the Party who actually memorialized this Agreement in final form.

## ARTICLE TWO: STOCK PURCHASED AND LIEN RELEASES

2.1 **Stock Purchased**. Seller agrees to sell to Buyer the Acquired Eleuthera Stock and Buyer agrees to purchase from Seller the Acquired Eleuthera Stock subject to the terms of this Agreement. The Parties agree that the value of the Acquired Eleuthera Stock is $10,000 USD per share for a total of $8,000,000 (800 x $10,000), and the Parties stipulate that the HVS Appraisal dated July 2012 constitutes the agreed upon support for such a valuation.

2.2 **Lien Release**. Abiouness and RG Development agree to take any and all necessary action to release its lien rights through the filing of a UCC-3 at the time of conveyance of the Acquired Eleuthera Stock. The Parties agree that to the extent Abiouness and/or RG Development have other lien rights against Buyer and/or Seller, such lien rights shall remain in full force and effect.

## ARTICLE THREE: CONSIDERATION FOR PURCHASE OF STOCK

3.1 **Price Of Purchased Assets**. The consideration for the Acquired Eleuthera Stock shall be the conveyance, free-and-clear, by Buyer of 6,153,846 shares of Buyer's common stock, based on an agreed upon value of $1.30 USD per share (the "Cotton Bay Holdings' Shares") to Seller subject to those restrictions set forth in this Agreement, including but not limited to the Parties' respective approval during the due diligence period set forth in Section 2.3. Buyer shall be responsible for any sales and transfer taxes associated with the acquisition of the Cotton Bay Holdings' Shares.

## ARTICLE FOUR: REPRESENTATIONS OF SELLER

4.1 **Seller's Representations Generally**. Seller represents and warrants to Buyer to the best of its knowledge, information and belief the representations set forth in this Article.

4.2 **Authorization**. Seller is a limited liability company duly organized and existing in good standing under the laws of the State of Florida, and that the undersigned, Robert Fortson IV, as a Member of A&F Bahamas, LLC, a Florida limited liability company and majority member of Seller, is fully authorized to execute and deliver this Agreement on behalf of Seller, and this Agreement constitutes a valid and binding agreement of Seller in accordance with its terms as more particularly set forth in the Resolution of its Members attached as Exhibit A.

4.3 **Title To Assets And Defects**. Seller will be able to transfer and convey to Buyer good and marketable title to the Acquired Eleuthera Stock, free and clear of restrictions on or conditions to transfer or assignment, and free and clear of liens, pledges, charges or encumbrances, whether through Seller or any third party. Notwithstanding this representation, Seller represents to Buyer that it is taking title to the Acquired Eleuthera Stock subject to those restrictions enforced by Eleuthera on the Eleuthera Stock at the time of conveyance of the consideration under this Agreement.

4.4 **Restrictions Related to Consideration**. The Cotton Bay Holdings' Shares shall be characterized as "restricted securities" under the Federal securities laws and that under such laws and applicable regulations such securities may be resold without registration under the Act only in certain limited circumstances. Seller further agrees that the Cotton Bay Holdings' Shares are being acquired for investment for its own account, and not with a view to the resale or distribution of any part thereof. It is understood that the certificate(s) evidencing the Cotton Bay Holdings' Shares shall bear a legend substantially in the form below:

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR WITH ANY STATE SECURITIES COMMISSION, AND MAY NOT BE TRANSFERRED OR DISPOSED OF BY THE HOLDER IN THE ABSENCE OF A REGISTRATION STATEMENT WHICH IS EFFECTIVE UNDER THE SECURITIES ACT OF 1933 AND APPLICABLE STATE LAWS AND RULES OR UNLESS SUCH TRANSFER MAY BE EFFECTED WITHOUT VIOLATION OF THE SECURITIES ACT OF 1933 AND OTHER APPLICABLE STATE LAWS AND RULES.

**4.5 Transfer Not Subject To Encumbrances Or Approval by Eleuthera.** The execution and delivery of this Agreement by Seller and the consummation of the contemplated transactions, will not result in the creation or imposition of any valid lien, charge or encumbrance on any of the assets, and will not require the authorization, consent, or approval of any third party, including any governmental division or regulatory agency, or Eleuthera.

**4.6 Litigation.** Seller has no knowledge of any claim, litigation, proceeding, or investigation pending or threatened against Seller that might result in any material adverse change in the business or condition of the Acquired Eleuthera Stock.

**4.7 Accuracy Of Representations And Warranties.** None of the above representations or warranties of Seller contain or will contain any untrue statements of a material fact or omit or will omit or misstate a material fact necessary in order to make Seller's statements in this Agreement not misleading. Seller knows of no fact that has resulted, or that in the reasonable judgment of Seller, will result, in material change in the business, operations, or assets of Seller or its affiliates that has not been set forth in this Agreement or otherwise disclosed to Buyer by Seller.

## ARTICLE FIVE: REPRESENTATIONS OF BUYER

**5.1 Buyer's Representations Generally.** Buyer represents and warrants to Buyer to the best of its knowledge, information and belief the representations set forth in this Article.

**5.2 Authorization.** Buyer is a corporation incorporated under the laws of the State of Delaware and is a reporting company under the rules promulgated by the United States Securities and Exchange Commission, and Alfred E. Abiouness, Jr., as President of the corporation, is fully authorized to execute and deliver this Agreement on behalf of Buyer, and this Agreement constitutes a valid and binding agreement of Buyer in accordance with its terms as more particularly set forth in the unanimous resolution of the Board of Directors attached as Exhibit B.

**5.3 Purchase Not Subject To Third Party Approval.** Except as may be provided by law, the execution and delivery of this Agreement by Buyer and the consummation of the contemplated transactions, will not require the authorization, consent, or approval of any third party, including any governmental division or regulatory agency; however, notwithstanding, Buyer represents that it will be disclosing this Agreement in the normal course of being a reporting company under the rules promulgated by the United States Securities and Exchange Commission.

**5.4** Accuracy Of Representations And Warranties. None of the above representations or warranties of Buyer contain or will contain any untrue statements of a material fact or omit or will omit or misstate a material fact necessary in order to make Buyer's statements in this Agreement not misleading. Buyer knows of no fact that has resulted, or that in the reasonable judgment of Buyer, will result, in material change in the business, operations, or assets of Buyer or its affiliates that has not been set forth in this Agreement or otherwise disclosed to Seller by Buyer.

## ARTICLE SIX: REPRESENTATIONS OF RG DEVELOPMENT

**6.1 RG Developments' Representations Generally.** RG Development represents and warrants to Buyer and Seller to the best of its knowledge, information and belief the representations set forth in this Article.

**6.2 Authorization.** RG Development is a corporation incorporated under the laws of the State of Delaware, and Doug Maslo is fully authorized to execute and deliver this Agreement on behalf of RG Development, and this Agreement constitutes a valid and binding agreement of RG Development in accordance with its terms as more particularly set forth in the unanimous resolution of the Board of Directors attached as Exhibit C.

**6.3 Lien Release Not Subject To Third Party Approval.** Except as may be provided by law, the execution and delivery of this Agreement by RG Development and the consummation of the contemplated transactions, will not require the authorization, consent, or approval of any third party, including any governmental division or regulatory agency.

**6.4 Accuracy Of Representations And Warranties.** None of the above representations or warranties of RG Development contain or will contain any untrue statements of a material fact or omit or will omit or misstate a material fact necessary in order to make RG Development's statements in this Agreement not misleading. RG Development knows of no fact that has resulted, or that in the reasonable judgment of RG Development, will result, in material change in the business, operations, or assets of RG Development or its affiliates that has not been set forth in this Agreement or otherwise disclosed to Seller and Buyer by RG Development.

## ARTICLE SEVEN: REPRESENTATIONS OF ABIOUNESS

**7.1 Abiouness' Representations Generally**. Abiouness represents and warrants to Buyer and Seller to the best of its knowledge, information and belief the representations set forth in this Article.

**7.2 Lien Release Not Subject To Third Party Approval**. Except as may be provided by law, the execution and delivery of this Agreement by Abiouness and the consummation of the contemplated transactions, will not require the authorization, consent, or approval of any third party, including any governmental division or regulatory agency.

**7.3 Accuracy Of Representations And Warranties**. None of the above representations or warranties of Abiouness contain or will contain any untrue statements of a material fact or omit or will omit or misstate a material fact necessary in order to make Abiouness' statements in this Agreement not misleading.

## ARTICLE EIGHT: RELATED PARTY AND CONFLICT WAIVERS

**8.1 Related Party Disclosure**. Seller represents that it is a "related party" to Buyer, as that term is defined by the United States Securities and Exchange Commission, and that Buyer is required to make certain public reporting disclosures associated with this transaction.

**8.2 Conflict Waiver**. The Parties mutually waive any and all actual or perceived conflicts of interest related to this Agreement, and enter into this Agreement with the requisite authority represented herein.

## ARTICLE NINE: INDEMNIFICATIONS

**9.1 Sellers Indemnification**. Seller hereby agrees to indemnify and hold Buyer, its successors and assigns harmless from and against any and all claims, liabilities and obligations of every kind and description, contingent or otherwise, arising out of or related to the Acquired Eleuthera Stock prior to the conveyance of the consideration agreed to herein, and any and all damage or deficiency resulting from any material misrepresentation or breach of warranty or covenant, or nonfulfillment of any agreement on the part of Seller under this Agreement.

**9.2 Buyers Indemnification**. Buyer agrees to defend, indemnify and hold harmless Seller from and against any and all claims, liabilities and obligations of every kind and description arising out of or related to the Cotton Bay Holdings' Shares prior to the conveyance of the consideration agreed to herein, and any and all damage or deficiency resulting from any material misrepresentation, breach of warranty or covenant, or nonfulfillment of any agreement on the part of Buyer under this Agreement.

**9.3 Indemnification of Abiouness and RG Development**. Buyer and Seller, jointly and severally, agree to indemnify and hold Abiouness and RG Development harmless in the event Buyer or Seller make any misrepresentation in entering into this Agreement resulting in the seizing of the Cotton Bay Holdings' Shares or in the recording of a lien by any third-party resulting in Abiouness or RG Development losing their priority as senior and junior lienholder, respectively, as set forth in their respective Security Agreements with Seller.

## ARTICLE TEN: GENERAL PROVISIONS

**10.1 Notices**. All notices, requests, demands and other communications in connection with the terms and conditions of this Agreement shall be in writing and shall be deemed to have been duly given on the date thereof if delivered by hand and receipted for by the Party to whom said notice or other communication shall have been directed, or three (3) days after mailed by certified or registered mail with postage pre-paid, return receipt requested, or one (1) day after receipted deposit of such notice or other communication for overnight delivery in the hands of a nationally recognized overnight delivery service that keeps regular records of its deliveries, and addressed to the applicable Party at the addresses set forth above.

**10.2 Severability**. In the event that any provision of this Agreement is held to be invalid or unenforceable under any applicable statute or rule of law, then the remainder of the terms, provisions, covenants or restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated, and if a covenant or provision is determined to be unenforceable by reason of its extent, duration, scope or otherwise, then the Parties intend and hereby request that the Court or other authority making that determination shall only modify such extent, duration, scope or other provision to the extent necessary to make it enforceable and enforce it in its modified form for all purposes of this Agreement.

**10.3 Law Governing This Agreement**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Florida without regard to conflicts of law principles that would result in the application of the substantive laws of any other jurisdiction. Any action brought by either Party against the other Party concerning the transactions contemplated by this Agreement shall be brought only in a court whose geographical jurisdiction includes Broward

County, Florida (the "Court"). All Parties executing this Agreement agree to submit to the jurisdiction of the Court and waive trial by jury. The prevailing Party (which shall be the Party that receives an award most closely resembling the remedy or action sought) shall be entitled to recover from the other Party its reasonable attorney's fees and costs.

10.4 **Counterparts**. This Agreement may be signed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument and shall be effective as though all the necessary Parties had signed the same original of this Agreement. Any scanned, photocopied, facsimile, or other form of electronic signature hereon shall be given the same force and effect as an original signature.

IN WITNESS WHEREOF, each Party, intending to be fully and legally bound by this Agreement and its Exhibits, is signing this Agreement as of the Effective Date set out in the introductory paragraph set out at the beginning of the Agreement.

COTTON BAY HOLDINGS, INC.

By: /s/ Alfred E. Abiouness, Jr.
Alfred E. Abiouness, Jr.
Its: President

GLOBAL VENTURES GROUP, LLC

By: /s/ Robert Fortson, IV
Robert Fortson IV
A&F Bahamas, LLC
Its: Authorized Member

RG DEVELOPMENT, INC.

By: /s/ Doug Maslo
Doug Maslo
Its: Authorized Officer

ALFRED E. ABIOUNESS, SR.
/s/ Alfred E. Abiouness, Sr.